DECCA LIMITED

v.

The UNITED STATES.

No. 299–70.

United States Court of Claims.

Nov. 19, 1980.

Robert B. Russell, Boston, Mass., attorney of record, for plaintiff; Henry C. Nields and Russell & Nields, Boston, Mass., of counsel.

John J. Fargo, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant; B. Frederick Buchan, Jr., and Vito J. DiPietro, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

SMITH, Judge:

In an earlier opinion in this case,[1] the court held that claims 1, 4, and 11 of U.S. Patent No. 2,844,816 (the '816), issued July 22, 1958, and owned by plaintiff, Decca Limited (Decca), were valid and infringed by the United States (the Government). The case was referred to Trial Judge Browne for a determination of the amount of "reasonable and entire compensation" to which Decca is entitled under 28 U.S.C. § 1498 (1976). The case is now before the court on the Government's exceptions to Trial Judge Browne's findings of fact, opinion, and recommended conclusion of law. Decca has not excepted to any finding of fact or to the recommended conclusion of law; in almost all respects, Decca concurs in the trial judge's opinion.

We do not adopt the trial judge's opinion or his recommended conclusion of law. Although we have not appended hereto his findings of fact, we adopt them except as stated hereinafter and by separate order. In the separate order, we indicate what findings we adopt without modification, what findings we adopt as corrected by us, and what findings we reject without replacement.

We make our own determination of the quantum of recovery. The facts giving rise to our determination are stated. Any fact statements not having counterparts in the findings are to be taken as additional findings of the court.

I.

A. The '816 claims a radio navigation system in which three very low frequencies emitted by each of two or more transmitters at fixed locations are received by a receiver capable of lane-resolving.[2] The receiver accomplishes lane-resolving through its phase-difference indicator. The phase-difference indicator is operated by means of a coarse control and a fine control. The coarse control frequency-differences the signals received from each transmitter and then phase-compares the difference-frequencies, derived from the signals from one transmitter, with the difference-frequencies derived from the signals from another transmitter. The fine control phase-compares the lowest-frequency signals received from one transmitter with the lowest-frequency signals received from another transmitter. The frequency-differencing and phase-comparing enable the receiver to lane-resolve and to determine (a) a single hyperbolic line of position (LOP) if signals from only two transmitters have been received, and (b) a position fix from two intersecting hyperbolic LOP's where signals from three transmitters have been received.

Claim 1 of the '816 is an "independent" claim. Claims 4 and 11 are each dependent on claim 1 and are, therefore, of narrower

1. *Decca Ltd. v. United States*, 210 Ct.Cl. 546, 544 F.2d 1070 (1976).

2. For a more detailed description see our earlier opinion in *Decca Ltd., supra* note 1.

scope than claim 1.[3] Specifically, claim 4 is limited to a system in which three frequencies radiated from each of two or more transmitters are radiated in sequence. Claim 11 relates to a system in which the signals are radiated from three transmitters and the timing of the transmission of the signals is coordinated.

B. (1) The infringing system in the case at bar is the Omega system. Omega is a worldwide, very-low-frequency (VLF) radio navigation system designed, developed, constructed, and operated by the Government. The fully established system contemplated that the signal-generating component of Omega would consist of eight permanent transmitting stations, each station transmitting a three-frequency format.

In June 1964, the Government published a report containing a complete technical layout for the establishment of Omega. The report defined Omega as a worldwide system consisting of eight transmitting stations. In June 1965, the Government authorized and announced its authorization of a project to establish and operate Omega. The project was a "CNM-Designated Project." This meant that the Government, utilizing supervision by the Chief of Naval Materiel, was assuming the role of prime contractor for the project.[4]

By October 24, 1967, four three-frequency transmitting stations had been constructed and had achieved interim operational capability (IOC). These IOC stations were located in Norway; Trinidad; Forrestport, New York; and Hawaii. On October 24, 1967, the Government officially declared the IOC stations to be "interim operational." By this declaration the Government guaranteed that the stations would continuously transmit the Omega three-frequency format for at least 1 year.[5]

In September 1968, the Government authorized the establishment of eight permanent Omega stations. The stations were to provide a system of worldwide radio navigation and were to be located in Norway, North Dakota, Hawaii, Japan, Liberia, La Reunion Island, Argentina, and Australia. As of July 22, 1975, the expiration date of the '816, the Government had established the permanent Omega system to the following extent: The permanent stations in Norway, North Dakota, Hawaii, and Japan had been constructed and were operational;[6] substantial, though not complete, construction of the stations in Liberia, La Reunion Island, and Argentina had occurred. The Government was in possession of all necessary station electronics for the latter three stations. The three stations were not operational, however, because their helix coils had not been "tapped." Construction of the eighth station in Australia had not commenced, but contracts had been let for all essential material for construction of the station. The Government had either ordered or was in possession of all necessary station electronics for the station.

(2) A necessary component of the Omega system is a receiver capable of receiving and processing all three frequencies transmitted by Omega stations. A receiver can resolve lane ambiguity only if it has such capability and receives and processes all three Omega frequencies.[7]

---

3. See Appendix A for a reproduction of claims 1, 4, and 11.

4. Overall responsibility for the project was vested in the Omega Project Office of the United States Navy.

5. The IOC stations in Norway and Hawaii were eventually converted into permanent Omega stations. The IOC station in Trinidad remained operational beyond July 22, 1975, the expiration date of the '816. The IOC station in Forrestport ceased functioning as an Omega station in 1973.

6. The station in North Dakota was declared operational on October 1, 1972. The permanent station in Norway was declared operational on December 20, 1973. The permanent station in Hawaii was declared operational in January 1975. The station in Japan was declared operational on April 30, 1975.

7. The Omega format is comprised of 10.2 kHz, 13.6 kHz, and 11⅓ kHz signals.

After lane ambiguity has been resolved, a receiver can determine its position merely by receiving and processing the 10.2 kHz frequency of the Omega format. Hence, although a single-frequency receiver is not capable of re-

The history of the Government's procurement of three-frequency receivers usable with Omega is as follows. The first use of the three-frequency Omega format occurred by June 1966. By that date, six companies had made and had tested three-frequency breadboards in anticipation of the Government's soliciting bids for a contract for three-frequency receivers. By Septemter 30, 1967, the Government was operating a bank of three receivers, each having only single frequency capability. Although the bank was receiving the full Omega format, the bank itself was not capable of lane-resolving and, hence, of determining position. To determine position through use of the bank, it was necessary for a human being to process the data provided by the bank. Neither a phase-difference indicator operated by a fine control and a coarse control nor a mechanical equivalent thereof was a component of the bank.

The Government first used a single receiver capable of lane-resolving in the manner taught by the '816 in June 1969. At that time, it installed and tested in an aircraft an AN/ARN–99(XN–1) receiver. The AN/ARN–99(XN–1) was the first automatic three-frequency receiver manufactured for the Government. During the term of the '816, the Government installed and used two AN/ARN-99(XN–1)'s and two AN/ARN–99(XN–2)'s.

The Government converted the AN/ARN–99(XN–1) into a receiver usable with submarines.[8] The converted receiver was an automatic three-frequency receiver labeled the BRN–7.[9] During the term of the '816, the Government assembled and installed in submarines eighteen BRN–7's.

In addition to the installed BRN–7's, seventy-seven BRN–7 receiver sets [10] were delivered to the Government during the term of the '816.

Two other three-frequency receiver models were used by the Government during the term of the '816: the AN/ARN–99(V)1 and the AN/ARN–99(V)4. Although sixty-four AN/ARN–99(V)1 receiver sets were delivered to the Government during the term of the '816, the Government assembled and installed only 14 of these prior to the expiration of the '816.[11] Eighteen AN/ARN–99(V)4 receiver sets were delivered to the Government during the term of the '816. Of these, two were assembled and installed prior to the expiration of the '816.

The AN/ARN–99(V)4 and the BRN–7 each process Omega signals by means of a computer which is built into the receiver. The computer provides a hyperbolic LOP readout. The AN/ARN–99(V)1 lacks a built-in computer. It must be connected to a general-purpose computer which is part of the craft or vessel on which the AN/ARN–99(V)1 is installed. The general-purpose computer processes Omega signals received by the AN/ARN–99(V)1. One of the fourteen AN/ARN–99(V)1's installed during the term of the '816 was connected to a general-purpose computer which provided a hyperbolic LOP readout. The other thirteen AN/ARN–99(V)1's installed during the term of the '816 were connected to general-purpose computers which provided only latitude/longitude readouts.

(3) Decca did not participate in the establishment of Omega and incurred no expenses in connection with the Government's project. Decca did not design any transmitters or three-frequency receivers for use

---

solving lane ambiguity, it can determine its position after it has been "initialized" through use of the full three-frequency Omega format. Initialization of a single-frequency receiver occurs when its beginning position is determined (a) by reference to a position indicated by a nearby three-frequency receiver or (b) in the case of a tuneable single-frequency receiver, by tuning it to each of the three frequencies.

8. Northrop Corporation developed, pursuant to a contract with the Government, the software which was used to accomplish the conversion.

9. The Government engaged Northrop Corporation to perform "first article" testing with respect to four BRN–7's.

10. A receiver set consists of the unassembled components of a receiver.

11. It should be noted that, in addition to the 64 delivered sets, thirty-one AN/ARN–99(V)1 sets had been manufactured, but not accepted by the Government, prior to the expiration of the '816.

with Omega. It did not develop any of these or other Omega components. During the term of the '816, it did not manufacture any Omega components for the Government. However, throughout the term of the '816, it was free to bid on procurement contracts let by the Government for Omega components. Moreover, because of the '816, Decca was in a position to control the civilian market for three-frequency Omega receivers.

Although Decca did not participate in the establishment of Omega, it utilized claims 1 and 11 of the '816 in building Decca Navigator Mark X (Mk X) systems. The Mk X is a low-frequency (LF), short-range system of radio navigation. While Mk X equipment is smaller than Omega equipment, the technical aspects of the operation of the two systems are virtually the same. Moreover, the problems encountered in erecting an Mk X system are substantially the same problems encountered in erecting Omega. By the expiration of the '816, Decca had erected and sold more than 40 Mk X systems.

Decca's sales of Mk X systems were in direct competition with sales of Loran-C systems. Loran-C is an LF hyperbolic navigation system. It was at the time the only feasible alternative to Omega in the context of choosing a system to provide worldwide navigation coverage. Prior to establishing Omega, the Government had installed and was operating Loran-C systems which provided navigation coverage of much of the Northern Hemisphere.

(4) Commercial licenses under the '816 were granted by Decca. In an agreement dated November 9, 1961, Decca, through its wholly owned American subsidiary, Decca Navigator System, Inc. (DNSI), granted, to Bendix Corporation, the first license to include the '816. The license authorized Bendix to make, have made, use and/or sell transmitters and receivers for Decca Navigator systems, including the Mk X, and Dectra systems. Encompassing the '816 and 60 other patents, the license was exclusive. Granted along with the license, in the same agreement, were a right of access to Decca's technical information concerning the licensed patents and a right to use Decca's trademark. The agreement (hereinafter the entire agreement will be referred to as the Bendix license) provided for a royalty rate of 7.5 percent to be applied to the net selling price of receivers, transmitters, and parts.

The Bendix license contained the following definition of transmitter:

* * * "Transmitter" shall mean all the technical equipment used in the production of satisfactory and reliable Decca or Dectra service from, but not including, the primary power supply to, and including, the dispatch of the service, but shall not include land, building, vehicles, diesels, real property improvements and the primary power supply.

The definition indicated what components of the price charged for constructing a transmitting station were to be excluded from the royalty base.

The Bendix license provided for an additional exclusion from the royalty base. This exclusion was stated as follows:

* * * In the case of sales or rentals under contracts involving research and development effort the net selling price or rental shall be an equivalent fair market value of the apparatus actually delivered and shall exclude payment received for research and development effort not directly reflected in the fair market value of the apparatus.

On March 31, 1969, Decca, again through DNSI, licensed ITT Navigator Systems, Inc. (ITT/NSI), to make, have made, use and/or sell "Licensed Equipment" for Decca Navigator systems, Dectra systems, and Omega (hereinafter the ITT/NSI license). "Licensed Equipment" was defined as transmitters, receivers, and parts "made or marketed by or for" Decca. In the case of "Licensed Equipment" for Omega, the qualification "if and when developed" was added to a description of the covered equipment.

The ITT/NSI license encompassed 29 patents, one of which was the '816. The license was to be exclusive after other, then

outstanding licenses expired in October 1970. Licensed along with the 29 patents were Decca's know-how and trademarks relating to the patents.

The ITT/NSI license provided for a royalty base consisting of the net selling price of "Licensed Equipment." With respect to covered equipment for Decca Navigator systems and Dectra systems, the license specified a royalty rate of 7.5 percent. With respect to covered equipment for Omega, the license specified a royalty rate of 5 percent. The 5 percent rate was to be applied for the 5-year period following the date of the first sale of covered Omega equipment. At the expiration of the 5-year period, the rate was to decrease to 2.5 percent except for items covered by one or more licensed patents which had not expired by the end of the 5-year period. The royalty rate for each excepted item was to remain at 5 percent until the item was no longer covered by an unexpired licensed patent.

## II.

■ Under 35 U.S.C. § 154 (1976), the owner of a United States patent is entitled "for the term of seventeen years [following the issuance of the patent] * * * to exclude others from making, using, or selling the [patented] invention throughout the United States." Section 1498 of 28 U.S.C. (1976) [12] authorizes the Government to take, through exercise of its power of eminent domain, a license in any United States patent. [13] Section 1498 provides the *sole* remedy available to a patentee for an eminent domain taking of a license in his patent. The remedy is monetary and must be pursued by means of an action in this court.

Section 1498 provides that the Government takes a license in a patent when one or more of the following incidents occur: manufacture or use by or for the Government of a patented invention. The section further provides that manufacture or use of a patented invention by a contractor, for and with the authorization of the Government, is to be "construed" as manufacture or use for the Government.

■ The Government takes a license to use or to manufacture a patented invention as of the instant the invention is first used or manufactured by the Government. The license taken at that instant covers only what the Government is using or has manufactured as of that instant. If, after this first taking, the Government expands the scope of its use of the invention or manufactures additional units of the invention, the Government engages thereby in incremental takings. Each incremental taking vests the patentee with a new cause of action. [14]

■ Because section 1498 authorizes the Government to take a license in any United States patent, the Government is never "guilty" of "direct infringement" of a patent insofar as "direct infringement" connotes tortious or wrongful conduct. The Government has a right to take patent licenses and cannot be enjoined from doing this. Moreover, a contractor engaging in patent-infringing manufacture or use pursuant to an authorization thereof contained in a procurement contract with the Government cannot be enjoined from its patent-in-

---

**12.** Section 1498 reads in relevant part:

"(a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

"For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person,

firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

**13.** *Leesona Corp. v. United States*, 220 Ct.Cl. ———, 599 F.2d 958, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *Crozier v. Krupp*, 224 U.S. 290, 305, 32 S.Ct. 488, 491, 56 L.Ed. 771 (1912).

**14.** *Irving Air Chute Co. v. United States*, 117 Ct.Cl. 799, 93 F.Supp. 633 (1950).

fringing activity. As stated earlier, the contractor's activity is deemed under section 1498 to be for the Government. Hence, the activity is clothed with the authority of the eminent domain power.

Because section 1498 is an eminent domain statute, the Government has consented thereunder only to be sued for *its taking* of a patent license. Expressed differently, section 1498 is a waiver of sovereign immunity only with respect to a direct [15] governmental infringement of a patent. Activities of the Government which fall short of direct infringement do not give rise to governmental liability because the Government has not waived its sovereign immunity with respect to such activities.[16] Hence, the Government is not liable for its inducing infringement by others, for its conduct contributory to infringement of others, or for what, but for section 1498, would be contributory (rather than direct) infringement of its suppliers. Although these activities have a tortious ring, the Government has not agreed to assume liability for them. In short, under section 1498, the Government has agreed to be sued only for its direct infringement of a patent.

The redress provided by section 1498 for such a direct infringement is "reasonable and entire" compensation for the patent license taken by the Government pursuant to its direct infringement.[17] One of the two components of "reasonable and entire" compensation for the license is the value of the license, determined ordinarily as of the time the Government takes the license. However, if the taking is an integral part of a governmental project involving more than one license-taking and if the Government announced, prior to the taking, that it would engage in the project, the value of the license must be determined as of the time the Government announced the project.[18]

To appraise a patent license taken by the Government, the court utilizes one of three methods of valuation: (1) determination of a reasonable royalty for the license;[19] (2) awarding a percentage of governmental cost savings arising from governmental use of the patented invention;[20] or (3) awarding lost profits.[21] Determination of a reasonable royalty for the license is the preferred method of valuation.[22] Where (a) *prior* to the time as of which the license taken by the Government is to be valued, the patentee has licensed the infringed patent commercially *and* (b) the rights of such a commercial licensee are the same or substantially similar to the rights taken by the Government, the court uses, virtually without exception, the reasonable royalty method to value the license taken by the Government.

15. Direct infringement of a patent consists generally of making, using, or selling the patented invention. With respect to the Government, direct infringement refers to governmental use or manufacture of the patented invention. Of course, governmental use or manufacture can occur either through authorized actions of governmental employees or through actions by contractors specifically authorized by the Government to engage in the actions for the Government.

16. *See Leesona Corp. v. United States, supra* note 13.

17. The measure of recovery quoted from section 1498 is equivalent to the just compensation which the fifth amendment mandates for every governmental taking. *Calhoun v. United States*, 197 Ct.Cl. 41, 453 F.2d 1385 (1972).

18. *See United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

19. *Calhoun v. United States, supra* note 17; *Amerace Esna Corp. v. United States*, 199 Ct.Cl. 175, 462 F.2d 1377 (1972); *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *Leesona Corp. v. United States, supra* note 13.

20. The court has used this method in only three cases: *Shearer v. United States*, 101 Ct.Cl. 196, *cert. denied*, 323 U.S. 676, 65 S.Ct. 187, 89 L.Ed. 549 (1944); *Marconi Wireless Tel. Co. v. United States*, 99 Ct.Cl. 1 (1942), *rev'd in part*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); and *Olsson v. United States*, 87 Ct.Cl. 642, 25 F.Supp. 495 (1938), *cert. denied*, 307 U.S. 621, 59 S.Ct. 792, 83 L.Ed. 500 (1939).

21. *Imperial Mach. & Foundry Corp. v. United States*, 69 Ct.Cl. 667 (1930).

22. *Leesona Corp. v. United States, supra* note 13.

The other component of "reasonable and entire" compensation for a patent license taken by the Government is delay compensation. Delay compensation is recompense for the Government's delay in paying for the license. Ordinarily, the court deems the value of the license to be payable as of the time the Government takes the license.[23] Hence, delay compensation begins to accrue, ordinarily, as of the date of the taking; and it continues to accrue to the date of payment of the judgment. When the court uses the reasonable royalty method to value the license, the court determines delay compensation by multiplying accrued royalties by an appropriate annual percentage rate. For the period 1947–75, the court uses the rates established in *Pitcairn*.[24] With respect to years after 1975, the court uses the 7.5 percent rate set by *Pitcairn* for the 1971–75 quinquennium, unless a plaintiff affirmatively demonstrates that a higher rate should be used.[25]

### III.

A. We turn now to a consideration of what the Government has taken from plaintiff, and when. The '816 claims a radio navigation *system*. Although the '816 describes the system in terms of the functions of the components of the system (the transmitters and the receivers), the components are not separately patented under the '816. Only their combination or integration into the system is patented thereunder. Thus, manufacture or use of operational transmitters, if this manufacture or use is not combined with manufacture or

use of one or more operational receivers, does not directly infringe the '816. Direct infringement does not occur until a system, comprised of two or more transmitters and one or more receivers, has been constructed and is available for use.[26] In the liability phase of this case (*Decca I*), we have determined that "it is when the receiver receives the signal * * * that there is a completed use of the system." [27]

B. Trial Judge Browne determined that the Government first took a license in the '816 on October 24, 1967, the date the Government declared the Omega IOC stations to be "interim operational." The trial judge based his determination, in part, on his finding that the Government's use by this date of the bank of three single-frequency receivers constituted a direct infringement of the '816. The Government argues that the bank is not similar to the Omega receiver models found to infringe in *Decca I* and, hence, that the trial judge's finding of direct governmental infringement as of the date in question is erroneous.

In *Decca I*, Decca accused two Omega receiver models to be infringing: the AN/ARN–99 and the BRN–7. Decca limited its proofs of infringement to these models. The court determined that the models were infringing.

To decide in the accounting phase of a patent infringement case whether an article not accused to infringe in the liability phase is infringing, the court limits its inquiry to the issue of whether the article is similar in structure and in mode of operation to the items found to infringe in

**23.** *Tektronix, Inc. v. United States*, 216 Ct.Cl. 144, 575 F.2d 832, *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978).

**24.** *Pitcairn v. United States, supra* note 19.

**25.** *Tektronix, Inc. v. United States, supra* note 23. In the instant case, Decca has shown that 8 percent should be used for years after 1975.

**26.** *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). That case holds that, where the novelty of a patented machine arises from the particular configuration in which its components are combined, mere manufacture of the

unassembled components of the machine does not amount to manufacture of the machine and, hence, does not directly infringe the patent claiming the machine. In other words, the "combination patent protects only against the operable assembly of the whole and not the manufacture of its parts." *Id.* at 528, 92 S.Ct. at 1706. That this is so even if the parts can be assembled to form the machine in less than 1 hour is made clear by *Deepsouth Packing Co.*

**27.** *Decca Ltd. v. United States, supra* note 1, 210 Ct.Cl. at 567, 544 F.2d at 1082.

the liability phase.[28] More specifically, the court examines the article to determine whether it has features similar to the patent-infringing features of the items. In the instant case, the issue is whether the bank of three single-frequency receivers is similar, in relevant respects, to the AN/ARN–99 and the BRN–7. We find that the bank lacks similarity.

The three single-frequency receivers comprising the bank were not interconnected. Hence, the bank could not effect a completed use of the system because it could not frequency-difference the three-frequency format transmitted by an Omega station. Because it could not frequency-difference the format, it could not lane-resolve. It lacked, in short, a phase-difference indicator operated by means of a fine control *and* a coarse control. The AN/ARN–99 and the BRN–7, on the other hand, each had such a phase-difference indicator. Through the operation of this phase-difference indicator, they were able to lane-resolve.[29]

The trial judge's determination that the Government had directly infringed the '816 by October 24, 1967, was based solely on his finding that the Government had used by this date the bank of three single-frequency receivers. The trial judge did not make a finding of any other basis for determining that the Government had directly infringed the '816 as of the date in question. Decca did not request the trial judge to make such a finding. Yet Decca contends now that, as of October 24, 1967, the National Aeronautics and Space Administration (NASA) was using a multifrequency receiver to receive Omega signals and that use of this receiver constituted direct infringement of the '816. The short answer to this belated contention of Decca is that it is not substantiated by evidence of record. The record does not indicate the specific structure of the NASA receiver or the actual starting date of use of the receiver.

 In addition to determining that the Government had directly infringed the '816 by October 24, 1967, Trial Judge Browne determined that, by this date, the Government had engaged in active inducement of infringement and in contributory infringement. The trial judge cited the pre-1967 use of three-frequency breadboards by six private companies as an example of the Government's having induced infringement.[30] According to the trial judge, 35 U.S.C. §§ 271(b) and (c) (1976), which impose liability on private persons for their active inducement of infringement and their contributory infringement, are incorporated by implication in 28 U.S.C. § 1498 (1976). Hence, under the trial judge's construction of section 1498, the Government is liable not only for its direct infringement of a patent but also for its active inducement of infringement and its contributory infringement.

 We disagree with the trial judge's construction. Section 1498 expressly waives the Government's sovereign immunity only with respect to governmental direct infringement of a patent. Nowhere in the section is active inducement of infringement or contributory infringement

---

**28.** *Pitcairn v. United States, supra* note 19; *Marconi Wireless Tel. Co. v. United States, supra* note 20; *Flat Slab Patents Co. v. Turner,* 285 F. 257 (8th Cir. 1922).

**29.** The ability to lane-resolve of the receiver described in the '816 is the heart of the '816 invention. The bank lacked this ability. Although, at this stage of the case, it is necessary merely to find that the bank is not similar to the AN/ARN–99 and the BRN–7, it is clear that the use of the bank did not infringe the '816.

It is true that a human being could lane-resolve by processing data provided by the bank. But such lane resolution would be the product of computations done by the human being, not the product of frequency-differencing and phase-comparing done by the bank. The structural element vesting the receiver described in the '816 with lane-resolving capability is a phase-difference indicator operated by means of a fine control and a coarse control. The processing of data by a human being is not the equivalent of this phase-difference indicator. *Brown v. Davis,* 116 U.S. 237, 6 S.Ct. 379, 29 L.Ed. 659 (1886).

**30.** It is clear that the use of the breadboards by the companies was not for and with the authorization of the Government. The use occurred prior to the Government's soliciting bids for its first contract for Omega receivers.

mentioned, either directly or by cross-reference to 35 U.S.C. §§ 271(b) and (c). A waiver of sovereign immunity must be strictly construed. Stated differently, the Government is not to be regarded as having waived its sovereign immunity by implication. Hence, we hold that 35 U.S.C. §§ 271(b) and (c) are not incorporated by implication in section 1498. It is our view that the Government has agreed under section 1498 merely to assume liability for its direct infringement of a patent; it has not agreed thereunder to assume liability for its active inducement of infringement or for its contributory infringement.[31]

 Decca appears to agree that 35 U.S.C. §§ 271(b) and (c) are not incorporated by implication in section 1498. Yet Decca contends that *Coakwell* [32] is authority for the proposition that the Government is liable for active inducement of infringement and contributory infringement. In support of its contention, Decca cites this language in *Coakwell*: "[Section 1498] was not intended to change the basic incidents to which liability would attach for the purposes of seeking comprehensive compensation for the unlicensed use of a patented invention." [33] Decca argues that the court intended "the basic incidents to which liability would attach" to signify all incidents of liability applicable to private infringers, including active inducement of infringement and contributory infringement. Decca urges that, because section 1498 "was not intended to change the basic incidents," the section must contemplate governmental lia-

bility for active inducement of infringement and contributory infringement.

Decca misreads *Coakwell*. The "basic incidents" of liability to which the court was referring were incidents of direct infringement, specifically, the making or using of a patented invention. The court did not examine in *Coakwell*, to any extent, the propriety of holding the Government liable for active inducement of infringement or contributory infringement.[34]

 For the reasons discussed above, we hold that the trial judge's determination that October 24, 1967, is the date the Government first became liable for infringement of the '816 is erroneous. The liability of the Government first arose when it directly infringed the '816 for the first time. The record establishes the date of its first direct infringement to be June 1969. In June 1969, it used, for the first time, a system consisting of the four Omega IOC stations and a single receiver capable of lane-resolving in the manner taught by the '816.[35]

C. The Government's use of the AN/ARN–99(XN–1) receiver to receive and process the three-frequency Omega format being transmitted by the IOC stations in June 1969 constituted, as pointed out in the preceding section, the Government's first direct infringement of the '816.

 The IOC stations provided radio navigation coverage of a geographic area substantially less than the entire world. Subsequent to its first direct infringement,

---

**31.** In *Leesona Corp.*, we made an observation which is equally apropos here:

"The fundamental error of the trial judge is that he has taken 28 U.S.C. § 1498, which is essentially an Act to authorize the eminent domain taking of a patent license, * * * and he has converted it to a consent to suit on a tort theory, and the treatment of the United States as a tort-feasor. * * *" *Leesona Corp. v. United States, supra* note 13, 220 Ct.Cl. at ――, 599 F.2d at 966.

Active inducement of infringement and contributory infringement sound in tort. They are descriptive terms for conduct which does not involve *the Government's* making or using a patented invention and thereby exercising its eminent domain power to take a patent license.

**32.** *Coakwell v. United States*, 178 Ct.Cl. 654, 372 F.2d 508 (1967).

**33.** *Id.*, 178 Ct.Cl. at 659, 372 F.2d at 511.

**34.** In *Coakwell*, the court distinguished use of a patented invention from purchase of a patented invention. The court intimated, in dictum, that section 1498 does not impose liability on the Government for merely purchasing a patented invention.

**35.** The receiver was the AN/ARN–99(XN–1), an automatic three-frequency receiver.

the Government expanded both the geographic coverage of and the incidence of use of the Omega system. It accomplished the twofold expansion by integrating additional operational Omega transmitters into the system and by acquiring additional operational three-frequency receivers. Each time the Government integrated, prior to the expiration of the '816, an additional operational transmitter into the system, it engaged thereby in an additional direct infringement of the '816. Likewise, each time it acquired possession of, prior to the expiration of the '816, an additional operational three-frequency receiver, it engaged thereby in an additional direct infringement. With respect to each of its additional direct infringements, the Government is deemed to have taken a license in the '816, the license conferring rights to the Government commensurate with the particular direct infringement covered by the license.

■ As of July 22, 1975, the expiration date of the '816, the Government had not completed construction of four of the eight permanent Omega stations. As of the date in question, the four unfinished stations were not yet operational. Hence, the Government's pre-July 22, 1975, activities involving the four stations, including its acquisition of station electronics for them, did not amount to a direct infringement of the '816.[36]

■ The Government possessed, as of July 22, 1975, 38 operational three-frequency receivers.[37] In addition, as of the same date, the Government possessed numerous unassembled three-frequency receiver sets; and it had ordered, but had not received delivery of, other three-frequency receiver sets. Its possession of the unassembled sets and its order of the undelivered sets did not amount to a direct infringement of the '816 because, as of the date of expiration of

the '816, these sets were not used or available for use in the system of operational Omega stations.

■ D. Fourteen of the operational three-frequency receivers which the Government possessed as of July 22, 1975, were AN/ARN–99(V)1's. Thirteen of these AN/ARN–99(V)1's were connected to general-purpose computers which could provide only a position readout, expressed in terms of latitude and longitude. Because the computers were not programmed to provide a hyperbolic LOP readout, the Government argues that the thirteen AN/ARN–99(V)1's connected to them were not similar to the AN/ARN–99 or the BRN–7, both of which can provide a hyperbolic LOP readout.

We disagree with the Government. Even though the computers could provide only a position readout, they determined position by lane-resolving in the manner taught by the '816. Specifically, through processing the Omega format transmitted by three stations, they determined two intersecting hyperbolic LOP's and then provided a readout of the point of intersection of the LOP's. The readout was expressed in terms of the latitude and longitude of the point of intersection. The readout, though not of a hyperbolic LOP, was the end-product of determining two such LOP's.[38]

IV.

A. Trial Judge Browne calculated the quantum of reasonable and entire compensation to which Decca is entitled, exclusive of delay compensation, as follows:

According to [the Government's] own estimates, implementation of the worldwide eight transmitter Omega system would result in a cost saving to [the Government], alone, of $640 million over a 10-year period as compared with Loran-

---

**36.** As of the expiration date of the '816, the four stations were not available for use with an operational three-frequency receiver capable of lane-resolving.

**37.** An operational receiver is a receiver the components of which have been assembled and made ready for use in assembled form.

**38.** It should be noted that the AN/ARN–99 and the BRN–7 can provide a position readout, as well as a readout of a hyperbolic LOP.

C, the best available noninfringing system. Prorated on an annual basis, the saving to [the Government] would be $64 million per year for the eight transmitter system. Half that figure ($32 million per year) would be reasonable to allocate to the four transmitter system. Applying that figure to the period from October 24, 1967 to July 22, 1975 (7 years, 9 months), the period during which the four transmitter system was in operation, the saving would amount to approximately $248 million. Applying to that figure a recovery factor of 20 percent * * * Decca would be entitled to the sum of $49.6 million. This figure, however, is subject to further adjustment to take into account the fact that the figures upon which it is based were only educated estimates used to stimulate congressional interest in funding the construction of the Omega system and were, no doubt, highly inflated. Therefore, it is believed to be proper to discount the figure by 50 percent in order to take into account the inflated nature of the original figures upon which the $49.6 million is based, thus reducing the net amount to $24.8 million. * * *

Thus, the trial judge used a cost savings method to calculate the value to Decca of the rights under the '816 taken by the Government.

The court has used a cost savings method of valuation in three previous patent infringement cases. In *Shearer* and in *Olsson*,[39] we used a cost savings method because the patents held to be infringed in those cases had not been licensed commercially. In *Marconi Wireless Telegraph Co.* we used a cost savings method because "great difficulty" would have attended our

determining a royalty base correspondent to the particular Marconi patent claim held to be infringed in that case.[40]

The factors which persuaded us to use a cost savings method in *Shearer, Olsson,* and *Marconi Wireless Telegraph Co.* are not present in this case. Decca has licensed commercially rights under the '816 which are similar to the rights thereunder taken by the Government.[41] The trial judge's findings of facts in this case, as modified by us, provide adequate means for our determining a royalty base correspondent to the rights under the '816 taken by the Government.

Defendant argues that Omega did not in fact displace defendant's use of Loran-C and points out that the alleged savings are speculative at best. No doubt Omega is an improvement over Loran-C just as Loran-A represented an advance in convenience over use of the alidade or dead reckoning, but we are not compelled to evaluate that possibility. The means exist in this case for a more conventional and substantiated measure of the liability legally incurred by defendant. That is all we are permitted to award, even though plaintiff might have obtained a larger amount if the infringer had not been the Government.

Because the reasonable royalty method is the preferred method of ascertaining the value of patent rights taken by the Government and because the facts of this case do not constrain us to use a method of valuation different from the preferred method, we decline to adopt the cost savings method by which the trial judge calculated his award of $24,800,000 basic compensation[42] to Decca;[43] and, therefore, we decline to

---

**39.** *Shearer v. United States* and *Olsson v. United States, supra* note 20.

**40.** *Marconi Wireless Tel. Co. v. United States, supra* note 20, 99 Ct.Cl. at 69.

**41.** The Bendix license and the ITT/NSI license are two such commercial licenses.

**42.** Basic compensation is reasonable and entire compensation exclusive of delay compensation.

**43.** The propriety of our rejection of this cost savings method is buttressed by the trial judge's admission that the keystone of the method, namely, the Government's estimate of what its total cost savings over a 10-year period would be, was "highly inflated." The unreliability of the estimate was underscored by the trial judge's determination that it should be discounted by 50 percent. Both the discount rate and the percentage of discounted cost savings awarded (20 percent) appear to be arbitrary.

adopt the award itself. We believe that it is necessary to use the reasonable royalty method to calculate the basic compensation to which Decca is entitled. Use of the reasonable royalty method involves a determination of a reasonable royalty base and a reasonable royalty rate.

B. To determine a royalty base reasonably correspondent to the scope of the Government's direct infringement of the '816, we have focused primarily on two issues: (1) whether the royalty base should include the entire cost of design and construction of an Omega transmitting station or only certain components of the cost; and (2) whether the royalty base should include the costs associated with the station electronics for the four unfinished permanent Omega transmitting stations and the costs associated with the unassembled three-frequency receiver sets in the possession of or ordered by the Government during the term of the '816. In addition to resolving these primary issues, we discuss below several miscellaneous matters pertinent to our determination of a reasonable royalty base.

1. Trial Judge Browne determined that it would be inappropriate to include in the royalty base the entire cost of design and construction of an Omega transmitting station: [44]

73. The cost of designing and constructing complete Omega *stations* includes the cost of items such as land, buildings for equipment[,] personnel, roads, prime power equipment, and diesel backup generators. The named items, however, are not part of the claimed invention of '816, nor are they items which must be specially created to utilize the '816 invention. The building used to

house the helix, however, is specially designed and constructed for use in the infringing system. Accordingly, that part of the cost of designing and constructing the Omega stations attributable to design and construction of land, buildings for equipment (except the helix building) and personnel, road, prime power equipment, and diesel backup generators are excluded from computation of the base. [Emphasis in original.]

In the view of the trial judge, Decca itself recognized the propriety of these exclusions from the royalty base by agreeing to their incorporation in the definition of transmitter contained in the Bendix license. Excluded from the meaning of transmitter, as the term was defined in that license, were virtually the same items which the trial judge determined to warrant exclusion from the royalty base here.

In effect, then, the trial judge regarded the definition of transmitter in the Bendix license as delineating a dividing line between components of the cost of an '816-type transmitting station to be included in a royalty base and components thereof to be excluded. The Government concurs in the trial judge's view of the import of the definition and in his determination, through use of the definition as a guidepost, of which components of the cost of an Omega station [45] are to be excluded from the royalty base here. [46] Decca, on the other hand, advances a different view of what the significance of the definition is; and it urges the court (a) to repudiate the trial judge's use of the definition as a guidepost for determining the royalty base and (b) to adopt a royalty base which includes the entire cost of an Omega station. [47]

**44.** Cognizant that the court might reject his cost savings approach, the trial judge discussed in some of his findings of fact the reasonable royalty method of appraising the rights under the '816 taken by the Government.

**45.** We use "Omega station" and "Omega transmitting station" interchangeably.

**46.** The components which the trial judge and the Government would include in the royalty base are as follows: the cost of procurement

and installation of station electronics, including the cost of design and construction of the station antenna; the cost of procurement and installation of electronic shielding for the helix building; and the costs for structural elements associated with the antenna.

**47.** Decca did not except, however, to any of the trial judge's fact findings in which his view that it is inappropriate to include in the royalty base the entire cost of an Omega station is set forth.

Decca assails on two grounds the trial judge's use of the definition as a guidepost. First, it points out correctly that the Bendix license did not convey any right pertaining to an Omega-type embodiment of the '816. The rights conveyed in the Bendix license related exclusively to Decca Navigator systems, including the Mk X, and to Dectra systems. Second, Decca contends (a) that, because the "license to Bendix * * * included a limited definition of transmitter which did not include the entire system," the license did not convey the right to "build and operate" an entire Decca Navigator or Dectra system; and (b) because this is so, the rights granted in the Bendix license were narrower in scope than the rights which the Government took for the purpose of establishing the Omega system. The conclusion which Decca seems to draw from its premises (a) and (b) is that it is entitled to a royalty base here which is broader than the definition of transmitter in the Bendix license because the scope of the rights taken by the Government is broader than the scope of the rights conveyed in that license.

Although the Bendix license did not convey any right pertaining to an Omega-type embodiment of the '816, the license did convey rights involving the Mk X system. The Mk X system is an embodiment of claims 1 and 11 of the '816.[48] By Decca's own admission, the Mk X system is "conceptionally [the] same" system as Omega and "the technical problems in the erection of the [Mk X] system were substantially the same" problems encountered by the Government in erecting Omega. Hence, the Bendix license concerned a navigation system which is substantially similar to Omega, i. e., the Mk X system.

Decca's contention that the Bendix license did not convey the right to build and use a complete Mk X system or any other Decca Navigator or Dectra system[49] is un-

tenable. As indicated earlier, Decca bases this contention on its view that the limited definition of transmitter contained in the Bendix license was intended to confine the transmission-related subject matter to which the rights conveyed in the license were applicable to the technical equipment providing the transmission service. This view of the intendment of the definition is, in our opinion, erroneous.

 We believe that the definition was intended merely to limit the scope of the royalty base under the license. We derive our belief, in part, from evidence of record which indicates that the definition was included at the insistence of the Bendix Corporation. Hence, it appears to us that the impetus for the inclusion of the definition was a concern by Bendix that, in the absence of such a definition, Decca might attempt to charge a royalty on the entire price of a Decca Navigator or Dectra system built and sold by Bendix.

Our view that the definition was not intended to preclude Bendix from building and using a complete system is reinforced by two other considerations. First, the Bendix license conveyed *in unqualified terms* the right to use transmitters and receivers. In other words, the license imposed no restriction on this right. Hence, this right must have included the right to combine transmitters and receivers into an operational system. Such a combination was the natural and likely use to be made of transmitters and receivers covered by the license.[50] Second, the license granted to Bendix the "exclusive" right to make and use transmitters and receivers. "Exclusive" was defined in the license as follows:

> * * * "Exclusive" shall mean, as applied to any rights granted herein, that neither the grantor nor any other person other than the grantee shall exercise such right.

---

48. It is recalled that Omega is an embodiment of claims 1, 4, and 11 of the '816 and that, of the three claims, claim 1 is the only independent claim.

49. Decca's corollary to this contention is that it reserved this right for itself.

50. Of course, the right to use transmitters and receivers by combining them into an operational system was, in effect, the right to make an operational system.

Hence, any combining of transmitters and receivers into a system was achievable only through Bendix.[51]

In conjunction with urging the court not to use the Bendix license definition of transmitter as a guidepost for determining the royalty base here, Decca asserts that "the entire market value rule" requires the court to fashion a royalty base which includes the entire cost of design and construction of an Omega station. Decca justifies this assertion as follows:

> When one looks at the entire market value in the case at bar, * * * one sees an unusually large and sprawling conglomeration of separate parts which make up the system. On the other hand, even though they may be widely separated physically, each contributes to the system as a whole, * * * and, in fact, each part performs a necessary function. For example, * * * [t]he station cannot be built without the roads to transport the heavy equipment. The helix and transmitters, if continuous operation is expected, must be housed. The personnel also must be housed. Utilities are also required. The environment of the transmitters and coils must be controlled. * * * In a nutshell, everything at the transmitting and monitoring stations is at least "reasonably" necessary or else it would not be procured, and if the Omega system had not been built, none of those items would have been procured or located at remote places of the world where they exist today * * *. * * *

 Decca misapprehends the entire market value rule. The rule is a judicially fashioned directive that, in certain instanc-

es, unpatented items used in combination with a patented invention are to be included in the royalty base for the invention. The directive applies only if the invention has substantially created the value of the items, i. e., the sole utility of the items consists in their being used in combination with the invention.[52] With respect to the Omega station items excluded by the trial judge from the royalty base here, the stated prerequisite to the applicability of the directive is absent. The land, buildings, roads, and other items excluded by the trial judge would have substantial utility and value even if all transmitting apparatus at an Omega station were dismantled and removed from the station. In short, the excluded items are susceptible of uses not involving the '816; and their value derives, at least in part, from this potential for other uses. Hence, the entire market value rule does not require that the items excluded by the trial judge be included in the royalty base.

In addition to invoking the entire market value rule to justify a royalty base which includes the entire cost of design and construction of an Omega station, Decca contends that, because it "normally would expect to sell such systems [as Omega] in their entirety as 'turn key' jobs," it is entitled to a royalty base which "correspond[s] to a reasonable open market, retail price for the system as a whole."[53] Decca's contention is, in effect, an attempt to recover vicariously, by means of an inflated royalty base, damages for the loss of business opportunity which Decca alleges to have suffered because of the Government's decisions (1) to establish Omega and (2) to act as its own prime contractor for this purpose. In Dec-

---

51. The holdings which we have made up to this point can be summarized as follows. The Bendix license did convey the right to build and use complete Decca Navigator and Dectra systems, including the Mk X. The royalty base under the license did not include the entire price of such systems. Both the conceptual nature of and the incidents characterizing the use of the Mk X-related rights conveyed in the Bendix license were substantially similar to the conceptual nature of and the incidents characterizing the use of the rights taken by the Government with respect to Omega.

52. See Tektronix, Inc. v. United States, 213 Ct.Cl. 257, 272, 552 F.2d 343, 351 (1977).

53. Decca asks the court to calculate the "open market, retail price for the system as a whole" by estimating what Decca would have charged the Government to build and demonstrate the operability of the entire Omega system, including the four IOC stations and the eight permanent stations.

ca's view, the first decision precluded Decca from selling an Omega-type system to anyone other than the Government and decision (2) precluded it from selling Omega to the Government.

■■■■ An insuperable obstacle to this attempt by Decca to recoup its alleged loss of business opportunity is that 28 U.S.C. § 1498 (1976) does not mandate compensation for such loss. In *Leesona*, we made an observation which is apropos here: [54]

> * * * Plaintiff's evidence placed scant emphasis on the actual value of the infringed patents to [plaintiff], which is what we must determine under § 1498, and more on the total loss suffered by the entire corporation as a consequence of losing both the exclusive domestic manufacturing rights and the procurement contract * * *. Just compensation in eminent domain does not recompense such injury. * * * [T]he tort theory under which such injury might be compensable was not applicable in a § 1498 taking case. There is a difference between evaluating the value of the property taken in light of plaintiff's business needs, and granting compensation for loss of business due to the taking, or for any incidental losses. The former is proper, the latter is not. *Gulf Refining Co. v. United States*, 58 Ct.Cl. 559, 577 (1923). That case neatly illustrates the proposition. The property taken was tank steamers; plaintiff was an oil company; business injury to plaintiff was not for consideration, * * *.

Decca is entitled under section 1498 to a royalty base reasonable correspondent to the portion of the planned Omega system which was operable as of July 22, 1975, *i. e.*,

to a royalty base reasonably correspondent to the scope of the Government's direct infringement of the '816, the scope being measured as of the date the '816 expired. A royalty base corresponding to a retail price for the entire planned Omega system would exceed on a massive scale the base just described. Our using such an inflated base would be tantamount to our awarding Decca the profit which it would have made had it been able to capitalize on its once-existing opportunity to sell an Omega-type system. Because section 1498 does not mandate compensation for the loss of this or any other business opportunity, it would be improper for us to use the inflated base in question.[55]

Finally, we believe that Decca's having agreed to inclusion in the Bendix license of the limited definition of transmitter discussed heretofore is a reliable indication that, had Decca and the Government negotiated a patent license authorizing the Government to establish Omega, Decca would have agreed in such a license to a royalty base from which was excluded the same items excluded from the definition of transmitter in the Bendix license. A royalty base fashioned in this manner is, we believe, reasonable. Therefore, we adopt the trial judge's determination of which components of the cost of an Omega station are to be excluded from the royalty base.

2. We turn now to the issue whether the royalty base should include the costs associated with the station electronics for the four unfinished permanent Omega stations[56] and the costs associated with the three-frequency receiver sets which, during the term of the '816, the Government had ordered but had not received or had not assembled and made operable. The trial

---

**54.** *Leesona Corp. v. United States, supra* note 13, 220 Ct.Cl. at ——, 599 F.2d at 972–73.

**55.** Even if we were able to consider the merits of Decca's loss of business opportunity claim, we would be confronted with two seemingly intractable issues: (1) the extent, if any, to which the Government, had it lacked the eminent domain power to take patent rights, would have established an Omega system; and (2) the extent, if any, to which persons other than the Government would have established an Omega-

type system had the Government chosen either (a) not to establish Omega or (b) to establish an Omega system providing less than worldwide coverage.

**56.** It is recalled that, as of the expiration date of the '816, the Government had let contracts for procurement of all the station electronics in question and had received delivery of most of these electronics.

judge determined that all these costs should be included in the royalty base. He justified their inclusion as follows:

> * * * Since all of defendant's activity in the procurement of equipment for transmitting stations and three-frequency receivers up to July 22, 1975 was intended for use in the infringing Omega system, such procurement was contributory to, or actively induced the infringement; hence, such procurement is includable in the compensation.

The validity of the trial judge's justification pivots on the validity of the following syllogism. (1) By contracting to supply the Government with the station electronics for the four unfinished stations and with the three-frequency receiver sets in question and by being aware that the Government intended to integrate these items into an already existing Omega system, the Government's suppliers engaged in contributory infringement. (2) The Government is liable under section 1498 for the contributory infringement of its suppliers. (3) Therefore, the royalty base must include the station electronics and three-frequency receiver sets in question, these items having been the subject of contributory infringement by the Government's suppliers. If this syllogism is valid, we must affirm the trial judge's inclusion of these items in the royalty base.

■ The syllogism is invalid because the second premise thereof is erroneous. Section 1498 does not render the Government liable for the "contributory infringement" of its suppliers. The section waives the

Government's sovereign immunity only with respect to governmental direct infringement of a patent.[57] Because the station electronics and three-frequency receiver sets in question had not been made operable as of the date of expiration of the '816, they were not involved in the Government's direct infringement of the '816.[58] Because they were not involved in the Government's direct infringement, they cannot be included in the royalty base. To include them would be to award Decca compensation for the "contributory infringement" of the Government's suppliers. This we are not empowered to do, the Government's sovereign immunity remaining a bar to such an award.[59]

■ 3. Having resolved the primary issues, we focus now on several miscellaneous matters. First, the Government excepts to the trial judge's inclusion in the royalty base of 60 single-frequency receivers which Decca alleges it would have used to monitor and calibrate the Omega system had it been engaged by the Government to build and demonstrate the operability of the system. The Government's exception has merit. There is no evidence of record indicating the identity or quantity of what *the Government* used to monitor and calibrate the system. What the Government actually used for this purpose, not what Decca would have used, is the relevant issue. Hence, we do not include the 60 single-frequency receivers in the royalty base.

■ Second, we include in the royalty base a portion of the cost which the Govern-

57. These principles are discussed more thoroughly in sections II and III B of this opinion, *supra.*

58. It should be noted that the four unfinished stations were being built for the purpose of expanding the geographic coverage of the Omega system, rather than for the purpose of assisting in the maintenance of the scope of coverage which the system provided as of July 22, 1975. Hence, the four unfinished stations cannot be included in the royalty base pursuant to any theory commending inclusion of spare parts.

59. Moreover, premise (1) of the syllogism is of doubtful validity. Contributory infringement is

a generic term for conduct which contributes to the enlargement of an already existing direct infringement. Only because the direct infringement is tortious is the conduct contributory to it tortious. Hence, absent a tortious direct infringement, there can be no contributory infringement.

The Government's "direct infringement" of a patent is not tortious because the Government is deemed to have taken a license in the patent authorizing its direct infringement. Thus, governmental suppliers can be said not to be guilty of contributory infringement insofar as this term connotes tortious conduct.

ment incurred to develop software for the BRN–7. The portion we include has been calculated by multiplying the cost by the fraction $^{18}/_{97}$. The numerator of the fraction is the number of BRN–7 sets assembled and made operable by the Government during the term of the '816. The denominator is the number of BRN–7 sets ordered by the Government during the term of the '816. Because the software development cost is "directly reflected in the fair market value" of the BRN–7, it is not the type of cost which the R&D exclusion in the Bendix license would have covered.

Third, we do not include in the royalty base the cost of the "first article" testing of BRN–7's. Because this cost is not "directly reflected in the fair market value" of the BRN–7, it is the type of cost which the R&D exclusion in the Bendix license would have covered.

█ Fourth, we include in the royalty base a portion of the cost of the general-purpose computers to which were connected the AN/ARN–99(V)1's made operable by the Government during the term of the '816. We have calculated the portion by using a method suggested by the Government. The Government suggested the method when it stated:

> * * * [B]y subtracting the price of an OR–90/ARN–99(V) receiver-converter, which has no computer ($15,653), from the price of an OR–133(V)(2) URN receiver-computer set for an AN/ARN–99(V)4 set which does ($50,258), a difference of $34,605 is derived which represents a reasonable portion of the cost [of] the aircraft's central computer.

4. Guided by the foregoing analysis, we have determined that a reasonable royalty base is $27,245,679. We present in Appendix B how we have computed this amount.

C. Having determined the base, we must now find the appropriate royalty rate.

In the course of discussing the Bendix license in one of his findings of fact, Trial Judge Browne stated: "if the Government obtained a license from Decca or a sublicense from Bendix prior to litigation, the 7.5 percent royalty rate [in the Bendix license] would have been an established reasonable royalty rate." [60] In another of his findings of fact, the trial judge stated: "[i]f compensation is to be based on a reasonable royalty applied to the full market value of the system as it existed from October 24, 1967 to July 22, 1975, a royalty rate of 10 percent is adequate for the case at bar." [61] The only logical explanation for the trial judge's adding 2.5 percent to the "established reasonable royalty rate" of 7.5 percent is that (a) he believed that Decca is entitled under 28 U.S.C. § 1498 (1976) to recoup the cost which it is incurring to litigate this action and (b) he intended the 2.5 percent rate increment to be the means of effectuating the recoupment.

█ This court has held, however, that section 1498 authorizes neither a direct recovery of litigation expenses [62] nor their recovery by vicarious means, e. g., augmenting a commercial royalty rate which has been set at fair market value. [63] Because the trial judge must be regarded as having determined in the second quoted finding of fact that 10 percent is a reasonable royalty rate if Decca's litigation expenses are to be considered in computing the rate and because the measure of recovery prescribed in section 1498 excludes consideration of litigation expenses, we have declined to adopt the second quoted finding of fact. We begin our determination of a reasonable royalty rate by focusing on the 7.5 percent royalty rate in the Bendix license, the trial judge having found that this rate represented "prior to litigation, * * * an established reasonable royalty rate."

**60.** Trial judge's finding of fact No. 127.

**61.** Trial judge's finding of fact No. 59.

**62.** *Leesona Corp. v. United States, supra* note 13, 220 Ct.Cl. at ——, 599 F.2d at 970.

**63.** *Calhoun v. United States, supra* note 17, 197 Ct.Cl. at 56, 453 F.2d at 1394.

The Government has excepted to this finding. The Government contends that a 7.5 percent royalty rate would be too high. It supports its contention with four arguments. First, it asserts that the ITT/NSI license, in which Decca agreed to a 5 percent royalty rate for Omega equipment,[64] is more probative of a reasonable royalty rate than is the Bendix license.[65]

Not only do we disagree with this assertion, we conclude that its converse is true, i. e., that the Bendix license is more probative of a reasonable royalty rate than is the ITT/NSI license. Our conclusion stems from the following considerations. Because the Government announced its project to establish the Omega system and because the project required the Government to engage in more than one taking of rights under the '816, the time as of which we must appraise the patent rights taken by the Government is the date the Government announced the project.[66] This date is June 1965. Hence, the value which we must ascribe to the taken patent rights is their value as of June 1965.

The Government's announcement of the Omega project precipitated a decline in the fair market value of the Omega-related rights under the '816.[67] The decline was attributable to the following factors. Because Omega was to provide worldwide radio navigation coverage, no other system of its kind was needed. Because no other system of its kind was needed, the Government was the only buyer or maker of such a system. Because of its eminent domain power and section 1498, the Government was under no legal constraint to negotiate with Decca for a patent license authorizing it to establish Omega. Because section 1498 shields governmental contractors from being held liable for contributory infringement,[68] contractors supplying Omega components to the Government or contributing in any other way to the construction of Omega were not required to obtain from Decca a license authorizing these activities.

The net effect of the aforementioned factors was to erode, almost completely, Decca's entitlement to monopoly control of the market for Omega-type systems.[69] Because the Omega-related rights under the '816 were the source of this entitlement and because their fair market value was attributable to the fact that they provided this entitlement, the erosion of the entitlement gave rise to a correspondent decline in their fair market value. By March 31, 1969, the date of execution of the ITT/NSI license, the decline had become substantial.

---

64. This rate was to decrease, upon the happening of certain events, to 2.5 percent.

65. The Government propounds two justifications for this assertion: (1) In the ITT/NSI license, Decca conveyed rights under the '816 which related specifically to Omega. No right conveyed in the Bendix license related specifically to Omega. (2) "[T]he ITT license indicates the relative valuation of patent and know-how rights. The ITT license indicates that 2.5 percent of the royalty rate is for know-how and 2.5 percent is for patents." The Bendix license, on the other hand, contains no indication of the relative valuation of the patent and know-how rights which were conveyed in it.

The first justification is factually correct. The factual correctness of the second justification is arguable. Even assuming that the second justification is factually correct, both justifications lack persuasiveness. They lack persuasiveness because, as explained hereafter in the text of this opinion, the ITT/NSI license was negotiated at a time when the fair market value of the Omega-related rights under

the '816 was substantially less than what it had been at the time as of which we must appraise the patent rights taken by the Government.

66. See United States v. Miller, supra note 18.

67. By "Omega-related rights under the '816," we mean the rights under the '816 which related to an Omega-type embodiment of the '816.

68. See Leesona Corp. v. United States, supra note 13.

69. As stated in the text, the erosion was not complete. Not only did the Omega project not impair Decca's monopoly control of licensings or sales of three-frequency receivers to potential nongovernmental users of Omega-type systems, the Omega project might have increased the opportunities for such licensings or sales. However, the potential for the licensings or sales in question constituted a relatively minor component of the market for Omega-type systems.

The royalty rate for Omega equipment which was negotiated in the ITT/NSI license reflected this decline.[70] The rate was, in short, substantially less than what it would have been had it been negotiated immediately prior to the Government's June 1965 announcement of the Omega project. Because of this fact and because the value which we must ascribe to the rights under the '816 taken by the Government is their value as of the June 1965 announcement, a reasonable royalty rate for the case at bar must be substantially higher than the royalty rate for Omega equipment in the ITT/NSI license.

Hence, the ITT/NSI license is not a reliable indicium of what is a reasonable royalty rate. The Bendix license, on the other hand, is. It was negotiated before the decline in the fair market value of the Omega-related rights under the '816 began.

■ The second argument which the Government makes to support its contention that a 7.5 percent royalty rate would be too high is that, unlike the Bendix license, the patent license taken by the Government was not exclusive. This alleged distinction is significant, according to the Government, because the royalty rate for an exclusive license in a patent is, ordinarily, higher than the royalty rate for a nonexclusive license in the same patent.

It is true that the patent rights taken by the Government were not exclusive in a legal sense. The Government was not entitled to exclude anyone else from establishing an Omega-type system. However, because Omega was to provide worldwide radio navigation coverage, there was no need

for another system of its kind. That anyone else would have chosen to incur the cost of establishing a system duplicative of Omega was extremely unlikely. Hence, the patent rights taken by the Government were, practically speaking, exclusive.[71]

■ The third argument which the Government makes to support its contention that a 7.5 percent royalty rate would be too high is that the royalty rate in the Bendix license would have been less than 7.5 percent had that license conveyed rights merely in the '816.[72] The short answer to this argument is that the '816 was the most valuable patent included in the Bendix license and, therefore, had Decca an Bendix negotiated a license in it alone, the royalty rate for such license would have been at least 7.5 percent.[73]

■ Finally, the Government argues that, because "over *90%* of the [Government-owned] receivers using the Omega system were 10.2 kHz [single-frequency] receivers—*which do not infringe* when combined with Omega transmitters" (emphasis in original), it is appropriate "to scale down the [7.5 percent] royalty rate [in the Bendix license] to take into account" this noninfringing use of the Omega system. For two reasons, we do not concur in this argument. First, only after a single-frequency receiver had been "initialized" through use of the full three-frequency Omega format could that receiver determine its position by receiving the 10.2 kHz Omega frequency. Second, the Mk X system, the Bendix license royalty rate for which was 7.5 percent, appears to have been susceptible of a

70. In the language of the trial judge, the rate was "depressed."

71. Our conclusion harmonizes with the trial judge's fact-finding that the patent license taken by the Government was the "equivalent of an exclusive license."

72. It is recalled that the Bendix license, in addition to conveying rights in the '816, conveyed rights in 60 other patents and in Decca's know-how concerning the 61 licensed patents. The know-how having been technical information

pertaining to the 61 licensed patents, the granting of rights in the know-how was ancillary to the granting of rights in the patents.

73. An observation which we made in *Leesona* is pertinent here: "[T]he number of patents involved in a licensing agreement is not the material factor in determining the license's worth; it is the value of the rights embodied in those patents." *Leesona Corp. v. United States, supra* note 13, 220 Ct.Cl. at ——, 599 F.2d at 976.

use with single-frequency receivers which was similar to the aforementioned use of Omega with single-frequency receivers.

■■■ Having considered the Government's arguments on the issue of what is a reasonable royalty rate, we turn to Decca's position on the issue. Decca contends that a 7.5 percent royalty rate would be too low. It bases its contention on the fact that the Mk X system was in direct competition with the Loran-C system. Decca argues that the 7.5 percent Bendix license royalty rate for the Mk X system was lower than what it would have been had the Mk X system not been in competition with another system.[74] Decca's corollary to this argument is that, because Omega was not in competition with another system, a reasonable royalty rate for the case at bar must be higher than 7.5 percent.

It is true that the Mk X system was in direct competition with the Loran-C system, whereas Omega was not in competition with another system. However, we regard this distinction as being offset by another distinction, namely, whereas Decca incurred substantial R&D costs with respect to the Mk X system, it incurred no R&D costs with respect to Omega. The fact that it incurred no R&D costs with respect to Omega would tend to lower a royalty rate for Omega by approximately the same amount as the fact that Omega was not in competition with another system would tend to raise such a rate.

74. The rationale underlying this argument can be stated as follows: Competition eventuates in smaller profits; smaller profits necessitate a smaller royalty rate.

75. All four IOC stations were operational in the three-frequency Omega mode as of this date. The date is an approximate midpoint of the month in which the Government operated, for the first time, a receiver capable of lane-resolving in the manner taught by the '816. The record before us does not indicate the particular June day on which the Government first operated the receiver (the ARN–99(XN–1)). We deem the first day of operation to be June 16.

76. The exception concerns the ARN–99(XN–1)'s. We calculate delay compensation for

In conclusion, we hold that a royalty rate of 7.5 percent is reasonable for the case at bar.

## V.

■■■ With regard to the IOC Omega stations, we calculate delay compensation from June 16, 1969.[75] With regard to the permanent Omega stations included in the royalty base, we calculate delay compensation from the dates on which these stations became operational in the three-frequency Omega mode. With regard to the three-frequency receivers assembled and installed during the term of the '816, we calculate, with one exception, delay compensation from the January 1's of the fiscal years in which the receivers were installed.[76] With regard to the spare parts allocable to the Omega system which was operational as of July 22, 1975, we calculate delay compensation from July 4, 1972, an approximate midpoint of the period June 16, 1969-July 22, 1975.[77] Our calculations of delay compensation are presented in Appendix C.

## CONCLUSION OF LAW

Decca is entitled to $2,043,425.92 basic compensation. It is entitled to $1,131,-033.49 delay compensation through June 30, 1980, plus additional delay compensation of $446.65 per day from July 1, 1980, to the day of payment of the judgment.[78] Judgment is entered accordingly.

them from June 16, 1969 (rather than from January 1, 1969). For the other receivers, we use the January 1's of the fiscal years in which they were installed because the trial judge found that "[g]enerally, the * * * installation instances occurred in the latter half of the fiscal year."

77. There is ample authority for our use of a midpoint: *Amerace Esna Corp. v. United States, supra* note 19; *Calhoun v. United States, supra* note 17.

78. The per day amount has been calculated on the basis of 1980 being a leap year. Hence, the amount applies only to days in 1980.

## APPENDIX A

The claims read as follows:

1. A hyperbolic radio navigation system in which a position line is determined by indicating the difference in the time of propagation to a receiver of signals emitted from two stations in known spaced geographical positions,

wherein three signals are emitted from a first station satisfying the respective phase conditions, given in radians of angle, $\eta_1\omega_0\tau + \alpha_1$, $\eta_2\omega_0\tau + \alpha_2$ and $(\eta_1 + 1)\omega_0\tau + \alpha_3$, and three signals are emitted from the second station satisfying the respective phase conditions $\eta_1\omega_0\tau + \kappa$, $\eta_2\omega_0\tau + \alpha_2 + \kappa$ and $(\eta_1 + 1)\omega_0\tau + \alpha_3 + \kappa$, where $\eta_1$ and $\eta_2$ are integers, $\omega_0$ is $2\pi$ multiplied by a fundamental frequency in cycles per second, $\tau$ is time in seconds and $\alpha_1$, $\alpha_2$, $\alpha_3$ and $\kappa$ are constants,

the transmissions being switched in sequence such that the signals of each frequency are transmitted from one station during intervals of the transmissions of the same frequency from the other station, and

the transmission being distinctively altered periodically for synchronising switching means at the receiver with the switching of the transmissions and

wherein the receiver comprises means for receiving the radiated signals,

switching means which are synchronised by the distinctive alteration in transmission and which are arranged to separate the received signals from the two transmitters, and

a phase difference indicator for indicating the difference in time of propagation which indicator has a recurrence cycle of time difference indication equal, in seconds, to the reciprocal of the fundamental frequency,

said indicator being operated by a fine control and a coarse control,

said fine control being dependent on a pair of signals derived from locally generated non-interrupted signals, one of which is phase-controlled by only one of the signals received from said first station and the other by only one of the signals received from said second station and the coarse control being dependent on six received signals, derived from the three different frequencies transmitted from each of the stations.

\*　　\*　　\*　　\*　　\*　　\*

4. A hyperbolic radio navigation system as claimed in claim 1

wherein, at each station, the various different frequencies are radiated in sequence.

\*　　\*　　\*　　\*　　\*　　\*

11. A hyperbolic radio navigation system as claimed in claim 1

wherein there is provided a third transmitting station radiating signals satisfying the respective phase conditions given in radians of angle, $\eta_1\omega_0\tau + \alpha_1 + \kappa_1$, $\eta_2\omega_0\tau + \alpha_2 + \kappa_1$, $(\eta_1 + 1)\omega_0\tau + \alpha_3 + \kappa_1$ where $\kappa_1$ is a constant,

the transmissions being switched in sequence such that the signals of each frequency are transmitted from one station during intervals of the transmissions of the same frequency from the other stations, and

wherein the receiver is provided with two of said phase difference indicators,

one indicator being arranged to indicate the difference in time of propagation of signals from the first and the second stations and

the other being arranged to indicate the difference in time of propagation of signals from the first and third stations.

[The format of the claims has been changed for easier reading and understanding.]

# APPENDIX B

## Calculation of Royalty Base

A. Transmitters Used in Infringing Combination.

| Station | Station Electronics (Components) | Station Electronics (Installation Cost) | Station Construction Cost Within Bendix License Definition of Transmitter | Total |
|---|---|---|---|---|
| 1. IOC Stations | | | | |
| Hawaii | $ 562,301 | (Included in components) | 0 | $ 562,301 |
| Forrestport | 620,151 | " | $ 30,000 | 650,151 |
| Norway | 569,940 | " | 1,119,783 | 1,689,723 |
| Trinidad | 658,656 | " | 839,701 | 1,498,357 |
| IOC Stations Total | $2,411,048 | | $1,989,484 | $4,400,532 |
| 2. Permanent Stations | | | | |
| North Dakota | $1,275,165 | $ 407,300 | $3,275,607 | $4,958,072 |
| Norway | 1,275,165 | 269,900 | 2,145,984 | 3,691,049 |
| Hawaii | 1,275,165 | 509,900 | 3,595,756 | 5,380,821 |
| Japan | 1,275,165 | 407,300 | 3,275,607 | 4,958,072 |
| Permanent Stations Total | $5,100,660 | $1,594,400 | $12,292,954 | $18,988,014 |
| Grand Total—All Stations | | | | $23,388,546 |

B. Receivers Used in Infringing Combination.

| | |
|---|---|
| 2 AN/ARN–99(XN–1)'s | $358,318 |
| 2 AN/ARN–99(XN–2)'s | 197,430 |
| 14 AN/ARN–99(V)1's | 798,696 |
| 2 AN/ARN–99(V)4's | 120,798 |
| 18 AN/BRN–7's | 981,179 |
| 38 Set Total | $2,456,421 |

C. Allocable Parts.

(1) Transmitters

| | | |
|---|---|---|
| AN/FRN–30 | 4/8 X $636,955 | $318,478 |
| AN/FRQ–18(V) | 4/8 X $660,403 | 330,202 |
| AN/FRT–88 | 4/8 X $572,703 | 286,352 |
| Allocable Spare Parts Total | | $935,032 |

(2) Receivers

| | | |
|---|---|---|
| AN/ARN–99(XN–1) and AN/ARN–99(XN–2) | | $48,393 |
| AN/ARN–99(V)1 | | 0 |
| AN/ARN–99(V)4 | 2/20 X $23,444 | 2,344 |
| AN/BRN–7 | 18/97 X $2,236,082 | 414,943 |
| Allocable Receiver Parts Total | | $465,680 |
| Total Allocable Additional Parts | | $1,400,712 |

D. Summary

| | |
|---|---|
| From A, Transmitters | $23,388,546 |
| From B, Receivers | 2,456,421 |
| From C, Allocable Parts | 1,400,712 |
| GRAND TOTAL FOR ROYALTY BASE | $27,245,679 |

| Rate | | Base | | Basic Compensation |
|---|---|---|---|---|
| 7–1/2% | X | $27,245,679 | = | $2,043,425.92 |

## APPENDIX C

Calculation of Delay Compensation

1. From June 16, 1969, through June 30, 1980:

| | Number of Years | X | Percentage | X | Accrued Royalty | | |
|---|---|---|---|---|---|---|---|
| 6/16/69–12/31/70 | 1.545 | | 0.065 | | $356,913.75 | = | $35,843.06 |
| | (for IOC stations and 2 ARN–99(XN–1)'s) | | | | | | |
| 1/ 1/71– 7/ 3/72 | 1.505 | | 0.075 | | 371,721.00 | = | 41,958.01 |
| | (for the above + 2 ARN–99(XN–2)'s) | | | | | | |
| 7/ 4/72– 9/30/72 | 0.243 | | 0.075 | | 476,774.40 | = | 8,689.21 |
| | (for the above + total allocable parts) | | | | | | |
| 10/ 1/72–12/31/72 | 0.252 | | 0.075 | | 848,629.80 | = | 16,039.10 |
| | (for the above + North Dakota permanent station) | | | | | | |
| 1/ 1/73–12/19/73 | 0.967 | | 0.075 | | 852,908.55 | = | 61,857.19 |
| | (for the above + 1 ARN–99(V)1) | | | | | | |
| 12/20/73–12/31/73 | 0.033 | | 0.075 | | 1,129,737.20 | = | 2,796.10 |
| | (for the above + Norway permanent station) | | | | | | |
| 1/ 1/74–12/31/74 | 1.0 | | 0.075 | | 1,142,573.40 | = | 85,693.01 |
| | (for the above + 3 ARN–99(V)1's) | | | | | | |
| 1/ 1/75– 1/14/75 | 0.038 | | 0.075 | | 1,268,008.90 | = | 3,613.83 |
| | (for the above + 10 ARN–99(V)1's, 2 ARN–99(V)4's, 18 BRN–7's) | | | | | | |
| 1/15/75– 4/29/75 | 0.288 | | 0.075 | | 1,671,570.50 | = | 36,105.92 |
| | (for the above + Hawaii permanent station) | | | | | | |
| 4/30/75–12/31/75 | 0.674 | | 0.075 | | $2,043,425.92 | = | 103,295.17 |
| | (for the above + Japan permanent station) | | | | | | |
| 1/ 1/76– 6/30/80 | 4.497 | | 0.080 | | 2,043,425.92 | = | 735,142.89 |
| | | | | | | | $1,131,033.49 |

2. From July 1, 1980, to Payment of Judgment:

| (Percentage | X | Accrued Royalty) | + | Days | | |
|---|---|---|---|---|---|---|
| (0.08 | | $2,043,425.92) | + | 366 | | |
| | $163,474.07 | | + | 366 | = | $446.65 per day[1] |

---

[1] This per-day amount has been calculated on the basis of 1980 being a leap year. Hence, the amount applies only to days in 1980.