**HUGHES AIRCRAFT COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 426–73.**

United States Court of Federal Claims.

April 29, 1994.

---

Victor G. Savikas, Los Angeles, CA, with whom were Sheldon Karon, Lawrence A. Wojcik and Sharon R. Barner, Chicago, IL, for plaintiff.

Thomas J. Byrnes, with whom were Asst. Atty. Gen., Stuart M. Gerson and Vito J. DiPietro, Washington, DC, for defendant. B. Frederick Buchan, Jr., William C. Bergman, Oscar A. Toiler, III, Robert A. Molan, Robert Ashbaugh, Rachel Jacobson, David M. Schlitz, Dept. of Justice, Washington, DC, and Paul F. McCaul, Nat. Aeronautics and Space Administration, Pasadena, CA, of counsel.

## OPINION ON COMPENSATION BASE

TURNER, Judge.

Hughes Aircraft Company owns U.S. Patent No. 3,758,051, entitled "Velocity Control and Orientation of a Spin–Stabilized Body," which describes an apparatus for controlling the attitude of a spin-stabilized spacecraft.[1] Hughes brought this action pursuant to 28 U.S.C. § 1498, seeking just compensation for the unauthorized use or manufacture by or for the government of spacecraft containing an embodiment of the patented apparatus.

### I

Hughes filed its complaint on November 13, 1973. Since then, the parties have en-gaged in a lengthy and costly litigation in both trial and appellate courts. (A description of the course of this litigation and references to background materials are set forth in the Opinion on Liability dated August 16, 1993, 29 Fed.Cl. 197, 201–02.)

In *Hughes Aircraft Co. v. United States,* 717 F.2d 1351 (Fed.Cir.1983), the Federal Circuit remanded the matter to this court for a determination of the damages due for 14 spacecraft adjudged to infringe. Consequently, the portion of this case occurring since the 1983 remand has been referred to as the "accounting" or "damages" phase. However, in addition to the 14 spacecraft adjudged to infringe in the "liability" phase, Hughes accused 94 spacecraft during this "accounting" phase, for a total of 108 accused spacecraft. Thus, this so-called "accounting" phase has entailed the determination of liability concerning the 94 newly accused spacecraft as well as a determination of damages with respect to all of the 108 spacecraft found to infringe.

Numerous liability issues were resolved during the course of the trial both by ruling and by agreement of the parties. All then-remaining liability issues were resolved by the Opinion on Liability dated August 16, 1993, 29 Fed.Cl. 197, 202–48. The appendix to said Opinion on Liability, 29 Fed.Cl. at 243–48, lists each of the 108 spacecraft accused during any stage of this litigation and sets forth, with references, the liability ruling with respect to each one.

### II

█ This opinion addresses all previously unresolved costs issues.[2] Resolution of these remaining valuation issues results in establishment of a compensation base[3] for compu-

---

1. The patent was issued to Hughes on September 11, 1973, as assignee of inventor and former Hughes employee, Donald D. Williams. The patent, commonly referred to as the Williams patent, expired on September 11, 1990.

2. See our earlier opinion at 15 Cl.Ct. 550, 551 n. 2 (1988), for a list of previously published opinions in this case and other cases involving the Williams patent. The instant opinion is the 15th published opinion directly involving the Williams patent.

3. The terms "compensation base" and "royalty base" are used interchangeably in patent litigation to designate both the totality of items and the aggregate dollar valuation of such items with respect to which royalties for patent use are calculated. *See, e.g., Decca Ltd. v. United States,* 225 Ct.Cl. 326, 349–53, 640 F.2d 1156, 1172–73 (1980); *Dynamics Corp. of America v. United States,* 5 Cl.Ct. 591, 597–98 (1984). In this opinion, we use the term "compensation base" primarily to mean the aggregate dollar valuation of all infringing items.

tation of damages to which plaintiff is entitled.

Of the 108 spacecraft accused in this litigation, plaintiff is entitled to recover compensation with respect to the government's manufacture or use of 81 spacecraft. *See* 29 Fed. Cl. at 243–48. Appendix B to this opinion lists each of the 81 spacecraft in the compensation base and sets forth precise royalty payment dates and valuations with respect to spacecraft in the compensation base.

A subsequent opinion will address issues pertaining to royalty rate and delay damages.

### III

There were thousands of costs issues requiring resolution as a predicate to final computation of a damages award. "With the many complex technical issues presented in this case, it is somewhat ironic that one of the most time-consuming areas involved the ascertainment of spacecraft cost." Pl.Br. (4/16/91) at 26. Most of these issues concerning spacecraft valuation were resolved by agreement of the parties and some were resolved by ruling during the course of the trial. (See Appendix B to opinion for citations to major stipulations and rulings pertaining to costs.) There remain for resolution cost issues pertaining to 28 spacecraft.

The remaining cost issues result from the parties' disagreement over the precise amount or the allocation of costs of items on 27 specific spacecraft (DSCS II QTV; FLTSATCOM QTV, FV 7 and 8; GPS FV 6, 15, 18 and 20 through 36; ISEE B, and SOLRAD 11A and 11B) and a dispute over whether the agreed value of a non-infringing satellite (AMPTE IRM) should nonetheless be included in the compensation base by addition to the value of an infringing vehicle (AMPTE CCE).

### A

One lingering cost issue is whether the value of AMPTE IRM[4] should be included in the compensation base. (See Opinion on Liability, 29 Fed Cl. at 237–39 & n. 61, 244 n. 3, for identification and description of the context of this cost issue.) The parties agree that the IRM, as a separate spacecraft, did not utilize the Williams invention. *See* 29 Fed.Cl. at 237 n. 61, 244 n. 3. Consequently, defendant maintains that its value should not be in the compensation base. Plaintiff asserts that the value should nonetheless be included either because the IRM was tantamount to "payload" of AMPTE CCE or as a result of the application of the "entire market value" rule in valuation of the CCE. (The parties agree on the cost of the IRM; they disagree only on whether such cost should be included in the compensation base.) We conclude that the cost of the IRM should be excluded from the compensation base.

Resolution of plaintiff's two arguments for inclusion require an understanding of the AMPTE program mission and of the configuration and deployment of the three AMPTE satellites. For a full description of the program, reference is made to the Opinion on Liability, 29 Fed.Cl. at 237–39 and to PX 1435A at 14–23. It will suffice for present purposes to give an abbreviated description as follows: Although each of the three spacecraft was an independently controlled satellite after launch and deployment in space, all three were part of a single program. All were launched together in a stack aboard a single launch vehicle, and their activities in space were carefully coordinated to achieve program mission. In broad terms, the CCE was deployed in an orbit approximately 30,-000 miles from earth within the magnetosphere while the UKS and the IRM were deployed in elliptical orbits having apogees outside the magnetosphere approximately 65,000 miles above the earth; the primary function of the IRM was to release lithium and barium ions—hence its name, Ion Release Module—outside the magnetosphere for study by the UKS and CCE, observation by the UKS to be far more immediate and before entry into the magnetosphere and subsequent detection and analysis by the

---

4. One of the spacecraft accused during the "accounting" phase. The acronym stands for Active Magnetospheric Particle Tracer Explorer, Ion Release Module. The two other spacecraft in the AMPTE program, all launched together on August 16, 1984, were the CCE (Charge Composition Explorer) and the UKS (United Kingdom Subsatellite). PX 1435A at 14.

CCE to be within the magnetosphere. Each of the three satellites was built in and provided by a separate nation. *See* 29 Fed Cl. at 237.

Plaintiff's theory that the IRM should be deemed payload for the CCE has some plausibility. The parties are agreed that the compensation base should include "total spacecraft cost,"[5] and this term has been consistently applied to include all spacecraft payload. Further, one may analogize the IRM, with its separate payload of tracer ions and its release function, to experimental payloads on numerous other spacecraft within the compensation base. Nonetheless, there are two reasons not to consider the value of the IRM as part of the "total spacecraft cost" of the CCE in the sense that value of payload has been included in the total cost of each other infringing spacecraft. First, if the proposed analogy is applied, the IRM would be "payload" for the UKS, a spacecraft not in the compensation base, *see* 29 Fed.Cl. at 240–41, to the same extent as for the CCE. Second, and more importantly, although the "payload" analogy is apt, the IRM was an entirely separate satellite, independently controlled in a far different orbit and containing its own additional diagnostic instrumentation, which simply had a supporting, coordinated mission essential to success of the CCE's mission and that of the overall AMPTE program. To stretch the analogy into a holding that the entirely separate IRM was "payload" for CCE would be to extend the general agreement of the parties that the value of all payload on each spacecraft in the base will be included in the total spacecraft cost beyond its original intent. A ruling consonant with the original understanding of the parties requires restricting the definition of "payload" of a spacecraft to items actually transported on that particular vehicle.

■ Plaintiff's second theory for inclusion relies on the "entire market value" rule applicable to royalty computation. This judicially created rule of base calculation finds its typical application in the commercial context and provides that if unpatented items accompanied the sale of an infringing item, the unpatented items will be included in the compensation base if the patent owner could have reasonably anticipated making the sale of the unpatented items had it sold the infringing item. *See Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327–28 (Fed. Cir.1987); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900–01 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 865–66 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22–23 (Fed.Cir.1984); *Decca Ltd. v. United States*, 225 Ct.Cl. 326, 349–51, 640 F.2d 1156, 1175–76 (1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981); *Leesona Corp. v. United States*, 220 Ct.Cl. 234, 260–64, 599 F.2d 958, 973–76, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979); *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 272–73, 552 F.2d 343, 351–52 (1977).

An especially clear statement of the critical element of the rule appears in *Paper Converting Machine Co.*, 745 F.2d at 23:

> The *deciding factor* . . . is whether '[n]ormally the patentee . . . can anticipate sale of such unpatented components as well as of the patented' ones. *Tektronix, Inc. v. United States*, 552 F.2d 343, 351 . . . (Ct. Cl.1977). If in all reasonable probability the patent owner would have made the sales *which the infringer has made*, what the patent owner in reasonable probability would have netted *from the sales denied to him* is the measure of his loss, and the infringer is liable for that.

(Emphasis added.)

In the circumstances of this case, plaintiff could not have reasonably anticipated the

---

**5.** The term "total spacecraft cost" in this litigation is understood to mean the total procurement cost to the government for an airborne (or qualification test) vehicle including the cost of designing and developing the vehicle, the cost of designing and developing its components and systems, the cost of assembling the systems, testing all systems and components, fabricating and testing the spacecraft, designing and developing the spacecraft payload, integrating the payload into the spacecraft bus and preparing the vehicle for launch, and including the value of all government furnished equipment.

sale of the IRM (or a contract for its development and fabrication) had it been awarded the contract for manufacture of the CCE. The AMPTE program involved three countries, each of which was responsible for development and manufacture of its spacecraft used in the program. The Applied Physics Laboratory of Johns Hopkins University, under a contract with NASA, was responsible for the development and construction of the CCE, PX 1435A at 15, yet plainly neither this contractor nor NASA was retained by Germany to develop the IRM also.

Based on the foregoing, we conclude that the value of AMPTE IRM should not be added to the valuation of AMPTE CCE or otherwise included in the compensation base.

**B**

■ The next cost issue pertains to the DSCS II QTV, i.e., the qualification test vehicle for the DSCS II program. The precise issue for resolution is whether the development (and thus non-recurring) costs related to the KIR–23 decryptor and the KGX–28 encryptor should be "charged" to the DSCS II program or whether these devices were first developed for another program.

There is no question that the devices were used on the DSCS II QTV and, consequently, no question that the relatively minor recurring costs related to the devices should be included. Further, there is agreement that the development costs for the coding devices amounted to $5 million, that the cost of the QTV without such development costs was $31.264 million (Pl.Br. (6/9/89) at 32) and that the coding devices were also used on spacecraft in other programs. The issue pertains solely to first use.

Defendant presented credible factual testimony of Albert T. Finney, the DSCS II program director with Aerospace Corporation, a firm organized to furnish general systems engineering support to the Air Force concerning space programs, including the DSCS II program (Tr. 9,486–94). Finney was an official acting on behalf of the Air Force in connection with the DSCS II pro-

gram from its inception in 1969 until the time of his testimony in 1988. One of his duties as program director was "to be responsible for expending funds on particular programs" (Tr. 9,495).

Finney was certainly in a position to know with certainty whether the encryptor/decryptor devices were developed initially for the program he was directing for the Air Force; he was emphatic and unequivocal that the coding devices in issue were actually developed for other programs (Tr. 9,535). Although called primarily as an expert witness on liability issues, his testimony concerning this critical cost issue was direct and factual. We find no reason to question this pivotal factual testimony and consequently accept it despite testimony from a witness called by plaintiff suggesting a contrary result.[6]

Based on the foregoing, we exclude from the compensation base the $5 million non-recurring development costs pertaining to the KIR–23 and KGX–28 coding devices and find that the aggregate cost of the DSCS II QTV was $31.264 million.

**C**

■ The next cost issue pertains to the FLTSATCOM QTV, i.e., the qualification test vehicle for the Fleet Satellite Communications program. The precise issue for resolution is the amount of the development (and thus predominantly non-recurring) costs related to the Fleet Broadcast Processor (FBP) (an electronic "black box" essential to encoding and decoding communications) used on each FLTSATCOM satellite.

The FLTSATCOM satellites, including the QTV, were all manufactured by TRW, Inc., an aerospace contractor. Under the terms of the contract between the Air Force and TRW for the FLTSATCOM QTV, the government was required to supply the FBP as "government furnished equipment" (GFE). (By coincidence, TRW was also the contractor, under a separate, preexisting agreement with the Naval Research Laboratory, for the development of the FBP.) Thus, the focus of

---

6. Even Joseph A. Malouin, the principal cost witness called by plaintiff, seemed to concede that these coding devices had their first application on classified programs, not on the DSCS II (Tr. 16,089, 16,282).

the present inquiry shifts to the total cost to the government for the initial FBP installed on the QTV.

The FBP development contract required some development effort related to ground stations and ground-based equipment (the ground segment) as well as to the airborne processor (the space segment). The parties agree, however, that only the development costs associated with the processor ultimately intended for flight vehicles should be included in the "total spacecraft cost" of the FLTSATCOM QTV.

The parties agree that the weight of the FBP was 29.5 pounds and that its development costs should be attributed to the FLTSATCOM QTV; they disagree only on the amount of such costs. (As noted below, the parties otherwise agree on the cost of the QTV.)

Defendant maintains that the development cost of the processor was $7.433 million; plaintiff asserts a cost of $30 million. Thus, the parties are $22.567 million apart in their assertions of aggregate cost of the FBP. Pl.Br. (6/9/89) at 46; Def.Br. (6/12/89) at 32.

Wendell Kestle, the expert principally relied on by defendant in connection with FBP development costs, used available contract documents and other available cost records to determine the amount actually paid by the government for FBP development. The total sum paid to TRW under the FBP contract was $14.915 million; in addition, equipment valued at $0.931 million was supplied by the government for a total contract value of $15.846 million.

Mindful that the development contract included ground segment items, Kestle carefully reduced the total contract value by cost items plainly related solely to the ground segment and by the cost of "long-lead" items (resulting in recurring costs) to be used on six FLTSATCOM vehicles (Tr. 13,759; DX 2608I35(A)–1, DX 2608I35(B)–1). He then reduced the $14.617 million balance by 50%

(because the general nature of the contract covered both the ground and space segments) and finally re-added to the $7.308 million space-segment balance the amount of $0.125 million representing the ⅙ portion of the "long-lead" items attributable to the QTV (Tr. 13,759–61), resulting in a total FBP development cost of $7.433 million.

The allocation of general costs under the development contract between the ground and space segments on a 50–50 basis, although not the only reasonable allocation which could have been made (Tr. 12,175–76), represented a consensus among three experienced experts called by defendant [7] (Tr. 13,-759–60; Tr. 12,175–76). This exercise of cost expertise and judgment seems quite reasonable.

Plaintiff's assertion of a $30 million cost for the FBP essentially rests on the admittedly vague recollection (Tr. 3342, 3348) of its expert, Joseph A. Malouin, a former employee of the Space Division, and Malouin's informal "cost-per-pound" analysis of electronic devices. At the time Malouin first prepared his estimate of development cost of the FBP (originally $50 million, revised to $30 million after presentation of defendant's cost evidence), he had no contract documents and no cost documents relating to it (Tr. 16,151).

Malouin's reliance on weight of the FBP as the "cost driver" is plausible and has general acceptance in the field (Tr. 11,421, 12,128), but adoption of his opinion on cost of the FBP requires acceptance of his conviction that the "per-pound" development cost of electronic devices like the FBP must invariably amount to approximately $1 million. We find actual development contract costs more persuasive.

The parties agree (given rulings made during the course of the trial) that the cost of the FLTSATCOM QTV less the FBP development cost was $71.973 million. They disagree to the extent of $22.567 million on the cost of the FBP and, hence, on the total cost

---

7. As of the time of trial, Wendell Kestle had 27 years of experience as a cost analyst, including the most recent 16 years as an analyst concerning space systems for Planning Research Corporation (Tr. 13,680–86; DX 2603A). The other two analysts involved in the allocation determination, Donald H. Strope and Barry G. Pincus, had 27 and 22 years of experience, respectively (Tr. 11,395–427, 12,148–49; DX 2603D, p. 1; DX 2603B, p. 1), including experience on behalf of both government space organizations and private industry.

of the FLTSATCOM QTV ($101.973 million versus $79.406 million). Pl.Br. (6/9/89) at 46; Def.Br. (6/12/89) at 32. Based on the foregoing, we find that the development cost of the FBP was $7.433 million and, thus, that the total cost of the FLTSATCOM QTV was $79.406 million.

### D

The next cost issues pertain to FLTSATCOM flight vehicles 7 and 8.[8] The parties agree on the cost of all portions of these two satellites except for the value of Extremely High Frequency (EHF) radio broadcast packages developed for these last two spacecraft in the program. Pl.Br. (6/9/89) at 51; Def.Br. (6/12/89) at 19–23. However, with respect to the EHF packages, the parties disagree not only on aggregate cost of the two items but also on the allocation of the total between satellites FV 7 and FV 8, a matter having an impact on delay damages.

As with the Fleet Broadcast Processor for the FLTSATCOM QTV, the EHF packages for FV 7 and 8 were furnished by the government without cost to the spacecraft manufacturer. Therefore, the initial focus of the inquiry shifts to the total expended by the government to acquire the EHF packages supplied for installation on FV 7 and 8.

Plaintiff values the two EHF packages at $124.5 million; defendant asserts the total cost of the packages to be $81.691 million. Pl.Br. (6/9/89) at 53; Def.Br. (6/12/89) at 24; Tr. 18,704. Thus, the total amount in dispute is $42.809 million.

The EHF packages were developed and fabricated at the Lincoln Laboratory of the Massachusetts Institute of Technology (Tr. 9825). The total paid to Lincoln Laboratory for its work on the packages was $106.07 million of which $81.691 million was attributable to the airborne devices and thus is the amount properly includable in the compensation base (Tr. 12,153–63; DX 2608I34(B), DX 2608I34(C)). Plaintiff's assertion of a higher cost is based on general references in budget planning documents and publications pertaining to defense spending; we find more convincing the statements from officials of the laboratory which actually designed and built the equipment concerning payments for the work and the portion of such payments attributable to the space segment.

The remaining issue concerning the EHF equipment is the allocation of the $81.691 million total between FV 7 and 8. Expert witnesses called by the parties differed on the percentage allocable to each because they differed on the "slope" of the learning curve applicable to fabrication of the second package (i.e., the one for FV 8). Although allocation of the costs between the two satellites has no effect on the total compensation base, it has an impact on delay damages because the two spacecraft were not launched simultaneously.

Plaintiff's expert would allocate approximately 90 percent of the total to FV 7, indicating a "steep" learning curve (Tr. 3539–41). The consensus of two experts called by defendant was that approximately 70 percent of the total should be allocated to the first flight vehicle, indicating a more gradual learning curve and resulting in higher recurring costs for the second package (Tr. 12,165). While all of the experts addressing the matter were highly qualified with extensive experience in the application of learning curves to estimate future costs and explain incurred costs, we are persuaded that the more gradual learning curve should be applied to the experimental broadcast packages developed and fabricated in a research laboratory. As explained by defendant's expert Barry G. Pincus, who had personal engineering experience in a research laboratory (Tr. 12,163), there is a predictable tendency of engineers in a research laboratory setting to continue to seek improvements and make refinements even after a first article has been completed and delivered (Tr. 12,163–64). Refinements would have been especially appropriate on the second article since there was the prospect that the technology would be applied to numerous other spacecraft (Tr. 16,180).

---

**8.** There were a total of nine spacecraft in the FLTSATCOM program consisting of the qualification test vehicle (QTV) and eight flight vehicles (FV 1 through FV 8).

Based on the foregoing, we adopt the defendant's rounded figures for allocation of the $81.691 million total cost of the EHF packages, to wit, $57.2 million for the first article on FV 7 and $24.491 million for the second article on FV 8. The parties appear to be in agreement, given cost rulings made during the course of trial, that the cost of FV 7 not including the value of the EHF box was $113.44 million and that the cost of FV 8 not counting the value of the EHF package was $85.579 million. Therefore, it is concluded that the total cost of FLTSATCOM FV 7 was $170.640 million and that the cost of FLTSATCOM FV 8 was $110.070 million.

### E

The GPS program has involved a total of 40 spacecraft.[9] There are unresolved cost issues pertaining to 20 of them, to wit, flight vehicles 6, 15, 18 and 20 through 36.

#### 1. GPS FV 6

■ The remaining issue pertaining to GPS FV 6 relates solely to the cost of a nuclear explosion detection system (NDS) developed for inclusion on the satellite when the GPS QTV was refurbished for use as a flight vehicle. Plaintiff contends that the total NDS cost attributable to FV 6 was $110 million ($100 million non-recurring, $10 million recurring), whereas defendant asserts a total of $8.357 million ($7.119 million non-recurring, $1.238 million recurring) (Pl.Br. (6/9/89) at 69). Thus, the parties disagree to the extent of $101.643 million.

The NDS was "government furnished equipment" supplied without cost to Rockwell International Corporation, the spacecraft manufacturer. Therefore, as with the Fleet Broadcast Processor for the FLTSATCOM QTV and the Extremely High Frequency broadcast packages for FLTSATCOM FV 7 and 8, the focus of the inquiry shifts to the total expended by the government to acquire the NDS which was installed on FV 6.

The NDS was developed and fabricated at th Sandia National Laboratory and at Los Alamos National Laboratory (DX 4608K35,

DX 4608K36). The total paid to both Sandia and Los Alamos Labs for their development and fabrication work on the NDS packages was $8.357 million (Tr. 11,748–55; DX 2600K1). Consequently, $8.357 million is the amount attributable to NDS includable in the cost of FV 6.

Plaintiff's assertion of a higher cost is based on the recollection, without supporting documentation, of plaintiff's principal cost expert concerning information received while he was an employee of Rockwell International and of the Air Force Space Division (Tr. 3620–21), on general references in budget planning documents and publications pertaining to defense spending, and on a very general cost-per-pound analysis (Tr. 16,201–09); we find more convincing the statements from officials of the laboratories which actually designed and built the devices concerning payments for the items (Tr. 19,962–92, 19,992–20,014, 20,024–52, 20,053–93; DX 4608K35, DX 4608K36).

Based on the foregoing, we find that the full cost of the NDS attributable to FV 6 was $8.357 million. The parties are in agreement, given cost rulings made during the course of trial, that the refurbishment cost of FV 6 not including the value of the NDS was $37.321 million. Therefore, it is concluded that the total refurbishment cost of GPS FV 6 was $45.678 million.

#### 2. GPS FV 15, 18 and 20 through 36

The series of GPS spacecraft from FV 13 through FV 40 was the subject of a separate, single contract between the Air Force and Rockwell International Corporation. This group of 28 satellites has been referred to in this litigation as Block II and the group consisting of FV 15, 18 and 20 through 40 has been referred to as Block II Improved. *See* Appendix A. (Although plaintiff conceded non-infringement of FV 37 through 40 since they had not been fabricated as of the patent expiration date, 29 Fed.Cl. at 215 n. 18, these four vehicles have some impact (though minor) on a determination of disputed costs of other satellites in Block II Improved.)

---

9. For a description of the Global Positioning System program and resolution of liability issues

pertaining to some of the satellites, see Opinion on Liability, 29 Fed.Cl. 197, 215–24 & n. 18.

The parties disagree on the precise value of all 19 satellites in Block II Improved found to infringe (FV 15, 18 and 20 through 36). However, with one exception, the remaining disagreements pertaining to this group of satellites do not concern cost of individual spacecraft but rather (1) overall program costs which must be spread over several or virtually all spacecraft in the group and (2) the method of allocating costs among the individual vehicles.

The sole dispute over cost of an individual spacecraft concerns the proper vehicle to bear the Block II Improved nonrecurring contractor costs. The parties agree that with respect to the 19 GPS satellites under discussion (FV 15, 18 and 20 through 36) there was nonrecurring *contractor* cost (i.e., without regard to cost of government furnished equipment) of $60.034 million; the parties further agree that this nonrecurring cost should be allocated to either FV 22 or 23. The nonrecurring cost at issue was development cost for a new W-sensor receiver-processor (a refinement to the nuclear explosion detection system). The disagreement is over which vehicle was the first to incorporate the sensor, plaintiff maintaining that FV 22 should bear these development costs and defendant asserting that the costs are properly allocated to FV 23.

It apparently is true that FV 22 was intended to be the first vehicle to incorporate the new sensor, and it may well be that the fabrication of FV 22 was commenced prior to that of FV 23. However, we find that, as between the two, FV 23 was the first to receive installation of the sensor, the first to be completely fabricated and tested, the first to be finally accepted by the government (as evidenced by government issuance of a form DD 250) and the first to be launched. Consequently, we accept the government's position that under the principles of cost estimation and analysis consistently applied in this litigation, the nonrecurring costs under discussion should be assigned to FV 23. (Given our determination of royalty due dates, see Appendix B at 3, the plaintiff obtains some

benefit from this allocation, since FV 23 has an earlier delay damages commencement date than FV 22).

All remaining cost disagreements pertaining to GPS Block II Improved are "group level" disputes. The total amount in dispute is $273.766 million. See Appendix A to this opinion for illustration of the computation of this figure and the positions of the parties concerning total cost of each spacecraft in Block II Improved. The amount in issue results from disagreements over the recurring costs of two major items of government furnished equipment[10] and by several items of disputed contractor costs.

■ The most significant of these "group level" disagreements involves cost of the nuclear explosion detection system (NDS) used on these 19 satellites.

Plaintiff contends that the total recurring NDS costs attributable to these 19 flight vehicles is $227.759 million, whereas defendant asserts a total of $29.905 million. (See PX 3018.315 at 2 and DX 4600K at 2A for statements of the conflicting positions pertaining to recurring NDS costs for each of the satellites.) Thus, the parties disagree to the extent of $197.854 million.

The NDS was "government furnished equipment" supplied without cost to Rockwell. Therefore, the focus of the inquiry shifts to the amounts expended by the government to acquire the NDS packages installed on these 19 spacecraft.

The NDS packages were manufactured at the Sandia National Laboratory and at Los Alamos National Laboratory (DX 4608K35, DX 4608K36). The total paid to both Sandia and Los Alamos Labs for the 19 NDS packages in issue was $29.905 million (Tr. 11,748-55; DX 4600K at 2A) (NUDETS column plus WSRP column).

Plaintiff's assertion of a higher cost is based on the recollection, without supporting documentation, of plaintiff's principal cost expert concerning information received while

10. There were three kinds of government furnished equipment on satellites in this series, to wit, encryptor/decryptor packages, nuclear detection systems and atomic clocks. The parties

have no disagreement over costs related to the encryptor/decryptor packages. There are, however, substantial differences pertaining to the other GFE items.

he was an employee of Rockwell International and of the Air Force Space Division (Tr. 3620–21), on general references in budget planning documents and publications pertaining to defense spending, and on a very general cost-per-pound analysis (Tr. 16,201–09); we find more convincing the statements from officials of the laboratories which actually designed and built the devices concerning payments for the items (Tr. 19,962–92, 19,-992–20,014, 20,024–52, 20,053–93; DX 4608K35, DX 4608K36).

Based on the foregoing, we find that the full recurring cost of the NDS attributable to these 19 spacecraft was $29.905 million.

■ The next "group level" cost issue also pertains to government furnished equipment, to wit, atomic clocks which were installed on FV 29 through 34. The parties differ to the extent of $70.044 million on these costs, the plaintiff contending that the total should be $85.2 million and the defendant asserting that the demonstrable actual cost was $15.156 million. Interestingly, plaintiff also asserts that the cost of these government furnished clocks should be placed entirely on FV 18 rather than on one or more of the spacecraft which actually carried the clocks in issue.

As with the NDS packages, plaintiff's assertion of clock costs is based, not on available actual historical data, but on budget projections and other cost estimates compiled well before the clocks were manufactured. We find more convincing the testimony from an official of Naval Research Laboratory, the procuring agency for the clocks (Tr. 19,755–72), and data pertaining to the procurement contracts with the two companies (Frequency Electronics, Inc. and Kernco, Inc.) which actually built the six clocks under discussion concerning payments for the items (DX 4606K33, DX 4606K34).

We find that the total cost of the government furnished clocks on these six vehicles was $15.156 million; we further find that this total for the government furnished clocks should be allocated among FV 29 through 34 in accordance with defendant's approach (DX 4600K at 1), rather than added to the cost of any earlier vehicle.

The remaining GPS Block II amount in dispute, $5.868 million, is attributable to disagreements over whether certain Block II contract line items and requested contract price adjustments should be included in the calculation of total spacecraft costs.[11]

The contract between Rockwell and the Air Force pertaining to this series of GPS spacecraft included two different compensation mechanisms. For the complete manufacture of the 28 satellites in Block II (FV 13 through 40), Rockwell was to be compensated on the basis of a firm fixed price (as modified from time to time during the course of the work). In addition to spacecraft production, Rockwell undertook in the contract to provide post-manufacture launch support and orbital operations support, compensation for which the parties agree is properly included in the compensation base; for these post-manufacture services, Rockwell was compensated on a cost-plus-fixed-fee basis. This difference in the manner of compensation has significance in resolving disputes over includable contract items because the production costs for the various satellites in the series are allocated to individual spacecraft by application of a cost reduction curve, resulting in "front end loading" of costs on the earlier flight vehicles and consequently impacting delay damages, whereas costs related to launch and orbital support for each individual vehicle are approximately equal.

11. The stated amount in dispute concerning Block II contract line items and requested contract price adjustments ($5.868 million) is less than that indicated by the parties in briefs (Pl.Br. (4/16/91) at 32–36; Def.Br. (4/16/91) at 47–50) and is essentially a balancing figure constituting the difference between the parties' well-established disparity pertaining to recurring costs of government furnished equipment ($197.854 million + $70.044 million = $267.898 million) and the clearly stated total cost difference related to Block II Improved ($273.766 million). See Appendix A. The variation, $0.994 million (to wit, $6.862 million less $5.868 million), is probably explained by the assumption that the parties used contract price information applicable to all spacecraft in Block II Improved, including GPS FV 37 through 40, see DX 4616K5 (Comparison of Plaintiff and DOJ Costs), whereas the remaining difference which we address is exclusive of costs allocable to those non-infringing vehicles.

The $5.868 million "group level" dispute which we now address reflects the circumstance that plaintiff (1) included in the Block II Improved spacecraft cost total the price of all contract modifications sought by Rockwell (and still under consideration as of the trial), without consideration of the likelihood that some of them might not be allowed by the contracting officer, (2) included all costs paid to Rockwell under the 28–vehicle Block II contract, even though not all of the costs were directly related to the spacecraft and (3) included the cost of a study to determine whether GPS FV 12 (the unlaunched Block II QTV) should be launched and used as part of a different Air Force mission. In addition, it appears that plaintiff allocated all contract modifications to the fixed-price portion of the contract even though some of the includable modifications related to contract line items applicable to the cost-plus-fixed-fee portion.

In contrast, defendant's figures are based on a reasonable assessment, supported by testimony of an Air Force engineering official having GPS program management responsibility (Tr. 19,664–69), pertaining to the contract modification requests which were likely to be granted and included only those. Similarly, defendant excluded from the total contract price (used as the starting point to determine the presumptive cost of each individual satellite) the cost of projects and items not directly related to total spacecraft cost and excluded the cost of the FV 12 study which is plainly a "buyer" or "user" cost pertaining to planning of another mission and thus is not includable in total spacecraft cost as that concept has been consistently applied in this litigation. We find defendant's approach convincing both with respect to a determination of "group level" contract costs and to the proper allocation of costs between the fixed-price and cost-plus portions of the contract.

Based on the foregoing, we concur·in and adopt defendant's position on the value of FV 15, 18 and 20 through 36 as reflected on Appendix A. Of course, the value assigned to a given spacecraft in this series depends in part on its place in the order assigned by the analyst applying a cost reduction curve (88% for these satellites) to spread aggregate spacecraft costs included in the fixed-price segment of the GPS contract over the flight vehicles contemplated in the contract. Thus, our adoption of the government's proposed value for each of these spacecraft necessarily implies that we also concur in the government's use of "DD 250 dates" (i.e., dates of formal acceptance by the Air Force) to determine the order of completion of the various satellites as a predicate to application of a cost reduction curve. This approach is consistent with that used for all other spacecraft with respect to which liability has been found, including earlier vehicles in the GPS program, and takes account of the reality that "learning" is involved in the testing phase of manufacture.

■ Notwithstanding the use of actual launch or formal acceptance dates just described to determine the cost of each satellite, we adopt plaintiff's position reflected on Appendix A concerning the commencement dates for the accrual of delay damages concerning FV 22 and 24 through 36 ("Plaintiff Date of Royalty Payment(s)"). This approach permits accrual of delay damages (on 90% of the total cost of these 14 flight vehicles) to begin on the date of patent expiration (September 11, 1990) rather than the formal acceptance dates urged by defendant (and reflected on Appendix A). *See* Tr. 16,926, 17,877–78.

We recognize that this method is a departure from the practice of using the launch date or the DD 250 date as the commencement date for calculation of delay damages consistently applied with respect to all other infringing satellites. However, such consistent use of launch or DD 250 dates was with the concurrence of plaintiff for convenience of all parties and the court. Although the commencement date approach we adopt for these 14 GPS flight vehicles is a departure from use of launch or DD 250 dates, we believe that since we have determined that a taking had occurred with respect to each of these 14 satellites as of the patent expiration date, use of a later damages accrual date would unfairly penalize plaintiff for agreeing to convenient use of launch or DD 250 date for other programs even though the literal moment of taking had necessarily occurred

earlier. Slavishly consistent application of DD 250 dates as urged by defendant would result in damages commencement dates months, in six instances more than a year, after occurrence of the taking and expiration of the patent, *see* Appendix A. Consequently, we conclude that the fairest approach under the circumstances peculiar to the GPS program is to adopt plaintiff's position concerning the commencement dates for delay damages for FV 22 and 24 through 36 as shown on Appendix A.

In summary concerning GPS FV 15, 18 and 20 through 36, we conclude that the total cost of each spacecraft and the proper commencement dates for delay damages are those set forth on Appendix B to this opinion.

F

■ The next cost issue pertains to ISEE B, which was launched on October 22, 1977 (PX 1435A at 299). (For a description of the ISEE program and the liability determination for ISEE B, see 29 Fed.Cl. at 236–37.) The parties are $10.662 million apart in their assertions of aggregate value of the spacecraft ($40.425 million versus $29.763 million) (Pl.Br. (6/9/89) at 74; Def.Br. (6/12/89) at 80–83).

ISEE B was supplied by the European Space Agency pursuant to a memorandum of understanding with NASA, 29 Fed.Cl. at 236–37 & n. 59, and was procured by ESA from the STAR consortium of European contractors, *see generally* 29 Fed.Cl. at 237 & n. 60. It was not designed, fabricated or tested by ESA directly except in ways typical for a buyer/user of a spacecraft constructed by an outside contractor (Tr. 12,751–52, 13,793–95).

To some degree, this issue is necessarily determined by the ordinary rules pertaining to burden of proof. To state the obvious, plaintiff bears the burden to prove all elements of includable costs by a preponderance of the evidence. The hard facts presented

by either party pertaining to the cost of ISEE B were scarce, but both sides presented testimony of competent experts who had studied available records. In addition, Donald H. Strope, one of the cost experts called by defendant, had conferred with ESA financial personnel concerning the types of information which particular ESA accounts were intended to capture (Tr. 13,050–56; *cf.* Tr. 16,465–66). *See generally* Federal Rule of Evidence 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). Strope also had personal experience working within NASA (Tr. 11,413–27), an organization similar to ESA in mission and in the practice of building some spacecraft in-house and overseeing the purchase of others from outside contractors. This combination of experience and research made Strope's opinion testimony concerning ISEE B particularly convincing (Tr. 11,656–63).

Although there is room for debate and plaintiff has presented plausible argument for inclusion of some costs in addition to the total asserted by defendant, we are persuaded that the total opined by Strope is the correct spacecraft cost. Consequently, we find that the aggregate cost of ISEE B was $29.763 million rather than the higher amount asserted by the plaintiff.

G

■ The final individual cost issue pertains to the combined value of SOLRAD 11A and 11B. These were two substantially identical satellites built in-house at the Naval Research Laboratory and launched together on March 15, 1976 (PX 1435A at 532). Both parties used NASA cost models to estimate these values. However, primarily as a result of the different cost models used by the parties' experts,[12] the parties are $8.646 mil-

---

12. In one sense it may be said that the cost experts for both parties used the same NASA cost "model" for SOLRAD 11A and 11B in that both sides used a model developed for non-military, non-Shuttle launched spacecraft, which would encompass the two satellites at issue (PX 1338A at 1–1, 3–2; Tr. 18,787). *See generally* Tr. 11401 (Strope: "Every time that I refer to a model, I

mean a cost model, a mathematical or statistical type model that relates cost to ... some physical parameters."). In this subpart, we use the term "model" in a generic sense to refer to what are really sub-models—distinct categories or classifications of spacecraft within the overall model. For instance, within the overall model, a cost analyst as a preliminary matter must decide

lion apart in their assertions of aggregate value of the two satellites ($36.220 million versus $27.574 million). Pl.Br. (6/9/89) at 78; Def.Br. (6/12/89) at 84.

We are persuaded by the government's position. The cost expert called by the government, Donald H. Strope, had extensive experience with NASA cost models and, indeed, had a hand in creating the model he used for SOLRAD estimates.

In contrast, plaintiff's expert, Darryl W. Webb, had no prior experience with NASA models, used the one he relied on because he was "specifically directed" to do so by a Hughes official (Tr. 5095) and declined to express any independent confidence in the model he used (Tr. 5092–93). He acknowledged that he was "given a task to do which consisted of using certain formulas with certain input data, and ... [then] made the calculations." Tr. 5095. The two most critical decisions in the plaintiff's expert's cost analysis, i.e., the classification of the SOLRAD 11's as "Explorer" or "non-Explorer" and whether a second simultaneously constructed satellite would be considered "second generation" rather than a follow-on spacecraft in the same generation as the first, were actually made by a Hughes official and simply accepted and applied by plaintiff's expert (Tr. 5062–63, 5067). However, we are persuaded that accurate determinations through the use of cost models require application of experience and judgment by the cost expert, not merely an accurate calculation based on a formula selected by an interested non-expert. See Tr. 10,651–53, 13,279, 13,301–02.

We are left with an "either-or" choice between the positions of the parties. We are persuaded by the testimony of Strope to the effect that the "Explorer" cost model used by him was the more appropriate by reason of the weight of the two spacecraft (and of the individual subsystems) and by his judgment that the costs attributable to SOLRAD 11B

whether to use the Explorer-class model or the non-Explorer class model; in general, Explorer-

were entirely non-recurring rather than "second generation" (and hence partially recurring) costs. Tr. 11,653–55. The two were manufactured together (and launched together) as a single project, not as a program with an initial flight vehicle and a later, follow-on spacecraft. PX 1435A at 532.

Based on the foregoing, we find that the aggregate cost of SOLRAD 11A and 11B was $27.574 million rather than the higher amount asserted by the plaintiff.

IV

This opinion resolves all heretofore undetermined costs issues in this litigation and establishes the compensation base for a determination of the damages to which plaintiff is entitled. Appendix B to this opinion lists each of the 81 spacecraft with respect to which liability has been determined and sets forth the precise royalty payment dates and valuations with respect to spacecraft in the compensation base.

In summary, the total of the compensation base for calculation of a reasonable royalty and delay damages is $3,577.518 million. See Appendix B.

A subsequent opinion will address the remaining issues of royalty rate and delay damages. Judgment will be withheld pending resolution of all damages issues.

APPENDIX A

OPINION ON COMPENSATION BASE

Following is an excerpt (page 6) of a joint statement of the parties submitted in open court during final argument on May 20, 1991 (Tr. 20,753–54, 20,890–91).

The portion included in this appendix illustrates, inter alia, the parties' relative positions concerning 19 satellites in the Global Positioning System program designated GPS FV 15, 18, and 20 through 36, collectively designated Block II Improved.

class spacecraft are less complex and less expensive (PX 1338A at 5–1).

## APPENDIX A—Continued

| PROGRAM & S/C QUANTITY | CONTRACTOR, CONTRACT TYPE & APPLIC. | PLAINTIFF COMPENSATION BASE | DEFENDANT COMPENSATION BASE | IN DISPUTE | DATE OF TAKING | PLAINTIFF DATE OF ROYALTY PAYMENT(S) | | DEFENDANT DATE OF ROYALTY PAYMENT(S) | |
|---|---|---|---|---|---|---|---|---|---|
| GPS II (28) | ROCKWELL 83-C-0031 FFP & COST PLUS | 1671.020 | 1397.234 | 273.766 | | | | | |
| | FV-13 = | 230.899 | 230.899 | | | (4/24/87) | (7/23/87) | | |
| | FV-14 = | 64.815 | 64.015 | | | (12/18/87) | (3/17/88) | | |
| | FV-16 = | 58.615 | 58.615 | | | (12/18/87) | (3/17/88) | | |
| | FV-17 = | 55.352 | 55.352 | | | (4/20/88) | (7/19/88) | | |
| | FV-19 = | 53.061 | 53.061 | | | (6/30/88) | (9/28/88) | | |
| | BLOCK II IMP. | | | | | | | | |
| | FV-18 = | 193.350 | 51.035 | 142.315 | (6/19/87) | (8/17/89) | (11/15/89) | | |
| | FV-22 = | 117.560 | 43.887 | 73.673 | (10/7/87) | (9/11/90) | (12/10/90) | (3/1/91) | (5/30/91) |
| | FV-20 = | 54.374 | 48.049 | 8.325 | (11/4/87) | (12/18/89) | (3/18/90) | | |
| | FV-21 = | 55.430 | 49.193 | 6.237 | (12/17/87) | (10/13/89) | (01/11/89) | | |
| | FV-15 = | 54.665 | 47.095 | 7.570 | (12/23/84) | (06/26/90) | (9/24/90) | | |
| | FV-23 = | 53.818 | 106.822 | 33.004 | (2/10/88) | (6/26/90) | (9/24/90) | | |
| | FV-24 = | 53.166 | 45.928 | 7.238 | (7/8/88) | (9/11/90) | (12/10/90) | (9/24/90) | (12/27/90) |
| | FV-25 = | 52.544 | 45.018 | 7.544 | (4/4/89) | (9/11/90) | (12/10/90) | (11/12/90) | (2/10/91) |
| | FV-26 = | 52.024 | 44.410 | 7.614 | (4/17/89) | (9/11/90) | (12/10/90) | (1/18/91) | (4/18/91) |
| | FV-27 = | 51.716 | 43.553 | 8.163 | (5/20/89) | (9/11/90) | (12/10/90) | (4/19/91) | (7/18/91) |
| | FV-28 = | 51.282 | 43.337 | 7.943 | (6/15/89) | (9/11/90) | (12/10/90) | (3/24/91) | (8/22/91) |
| | FV-29 = | 50.874 | 49.533 | 1.339 | (8/22/89) | (9/11/90) | (12/10/90) | (7/5/91) | (10/3/91) |
| | FV-30 = | 50.464 | 43.449 | 7.015 | (9/14/89) | (9/11/90) | (12/10/90) | (8/9/91) | (11/7/91) |
| | FV-31 = | 50.126 | 47.014 | 3.110 | (11/8/89) | (9/11/90) | (12/10/90) | (9/20/91) | (12/19/91) |
| | FV-32 = | 49.739 | 41.999 | 7.740 | (12/19/89) | (9/11/90) | (12/10/90) | (10/25/91) | (1/23/92) |
| | FV-33 = | 49.422 | 41.903 | 7.519 | (2/1/90) | (9/11/90) | (12/10/90) | (12/4/91) | (3/3/92) |
| | FV-34 = | 49.112 | 42.083 | 7.029 | (4/4/90) | (9/11/90) | (12/10/90) | (1/10/92) | (4/9/92) |
| | FV-35 = | 48.824 | 40.629 | 8.193 | (5/18/90) | (9/11/90) | (12/10/90) | (2/21/92) | (3/21/92) |
| | FV-36 = | 48.548 | 40.351 | 8.197 | (7/20/90) | (9/11/90) | (12/10/90) | (4/10/92) | (7/9/92) |

## APPENDIX B

### OPINION ON COMPENSATION BASE

This appendix contains a list of the spacecraft for which liability for a taking under 28 U.S.C. § 1498 has been found,[1] together with (1) royalty payment dates (i.e., the commencement dates for accrual of delay damages) and (2) the compensation base valuation for each of the spacecraft.

| SPACECRAFT | ROYALTY DATES[2] | | COMPENSATION BASE (in millions) | CITATION[3] |
|---|---|---|---|---|
| | 1st Date | 2nd Date | | |
| AMPTE (Active Magnetospheric Particle Tracer Explorer) (1) | | | | |
| 1. CCE | 08/16/84 | | $ 28.343[4] | Tr. 18,012 |

1. For a complete list of the 108 spacecraft accused at any stage of this case and the liability determination for each, see appendix to the Opinion on Liability filed August 16, 1993, 29 Fed.Cl. at 243–48.

2. The parties generally agree that delay compensation should begin to accrue on either the DD 250 date or the launch date with two exceptions. First, certain spacecraft were launched before the patent term began. The taking date for those spacecraft is September 11, 1973, the day the patent issued. Second, the patent expired before the DD 250 date and launch date for certain GPS spacecraft. With respect to those spacecraft, the date on which delay compensation begins to accrue is the date that the patent expired. Tr. 17,877–83.

When the launch date (or some later date) is used as the taking date, delay compensation accrues on 100% of the compensation base as of that date. When the DD 250 date (or some earlier date) is used as the taking date, delay compensation accrues on 90% of the compensation base as of that date and accrues on 10% of the compensation base as of the launch date or 90 days from the DD 250 date, whichever occurs first. (This division of the compensation base accounts for the fact that some portion of the costs associated with a spacecraft are not incurred until a spacecraft is actually launched.) Tr. 17,877–83, 17,909–10. This column provides a list of these dates. When one date is given, the 100% rule applies, and when two dates are given, the 90%/10% rule applies.

3. References in this column are to portions of the record which support the corresponding cost figures shown in the "Compensation Base" column.

4. Hughes asserts that the cost of AMPTE IRM should be included in the compensation base for AMPTE CCE under the entire market value rule and a related theory. See 29 Fed.Cl. at 237–39 & n. 61, 244 n. 3. If plaintiff's position had been adopted, the portion of the base represented by CCE would have been increased by $12.167 mil-

APPENDIX B—Continued

| SPACECRAFT | ROYALTY DATES 1st Date | 2nd Date | COMPENSATION BASE (in millions) | CITATION |
|---|---|---|---|---|
| CRRES (Combined Release and Radiation Effects Satellite) (1) | | | | |
| 2. | 03/31/87 | | 80.451 | Tr. 18,048 |
| CTS (Communications Technology Satellite) (1) | | | | |
| 3. | 01/17/76 | | 68.861 | Tr. 18,080 |
| DSCS II (Defense Satellite Communications System II) (17) | | | | |
| 4. QTV | 09/11/73 | | $ 31.264 | This opinion |
| 5. FV1 | 09/11/73 | | 8.341 | Agreement [5] |
| 6. FV2 | 09/11/73 | | 7.681 | Agreement |
| 7. FV3 | 11/06/73 | 12/13/73 | 7.508 | Agreement |
| 8. FV4 | 11/06/73 | 12/13/73 | 7.354 | Agreement |
| 9. FV5 | 04/09/75 | 05/20/75 | 7.190 | Agreement |
| 10. FV6 | 04/09/75 | 05/20/75 | 7.106 | Agreement |
| 11. FV7 | 05/12/77 | | 57.064 | Agreement |
| 12. FV8 | 05/12/77 | | 20.519 | Agreement |
| 13. FV9 | 02/08/78 | 03/25/78 | 19.578 | Agreement |
| 14. FV10 | 02/08/78 | 03/25/78 | 18.995 | Agreement |
| 15. FV11 | 10/05/78 | 12/14/78 | 18.581 | Agreement |
| 16. FV12 | 10/05/78 | 12/14/78 | 18.263 | Agreement |
| 17. FV13 | 10/18/79 | 11/21/79 | 17.999 | Agreement |
| 18. FV14 | 10/18/79 | 11/21/79 | 17.774 | Agreement |
| 19. FV15 | 03/28/80 | 06/27/80 | 17.582 | Agreement |
| 20. FV16 | 09/25/80 | 12/24/80 | 17.413 | Agreement |
| FLTSATCOM (Fleet Satellite Communications) (9) | | | | |
| 21. QTV | 02/06/78 | | $ 79.406 | This opinion |
| 22. FV1 | 12/01/77 | 02/09/78 | 65.923 | Agreement |
| 23. FV2 | 03/29/79 | 05/04/79 | 51.482 | Agreement |
| 24. FV3 | 10/29/79 | 01/18/80 | 50.920 | Agreement |
| 25. FV4 | 09/22/80 | 10/31/80 | 44.615 | Agreement |
| 26. FV5 | 06/28/81 | 08/06/81 | 40.605 | Agreement |
| 27. FV6 | 04/13/86 | 07/12/86 | 101.496 | Agreement |
| 28. FV7 | 09/28/86 | 12/04/86 | 170.640 | This opinion |
| 29. FV8 | 03/12/87 | 06/10/87 | 110.070 | This opinion |
| GPS (Global Positioning System) (36) | | | | |
| 30. QTV | 09/22/77 | | $ 17.813 | Agreement |
| 31. FV1 | 02/22/78 | | 27.875 | Agreement |
| 32. FV2 | 03/31/78 | 05/13/78 | 16.651 | Agreement |
| 33. FV3 | 10/06/78 | 10/7/78 | 14.953 | Agreement |
| 34. FV4 | 11/06/78 | 12/11/78 | 12.741 | Agreement |
| 35. FV5 | 11/30/80 | 02/28/81 | 10.494 | Agreement |
| FV6 [6] | 04/30/81 | 07/29/81 | 45.678 | This opinion |
| 36. FV7 | 01/07/80 | 02/09/80 | 11.767 | Agreement |
| 37. FV8 | 03/28/80 | 04/26/80 | 11.060 | Agreement |
| 38. FV9 | 07/30/84 | 09/08/84 | 23.697 | Agreement |
| 39. FV10 | 06/02/83 | 07/14/83 | 58.024 | Agreement |

lion, the agreed cost of IRM. However, as explained in the text of this opinion, plaintiff's position was rejected.

**5.** This designation, at each place it appears in the "Citation" column, indicates that, given prior rulings on disputed costs issues, the parties agree that the corresponding figure set forth in the "Compensation Base" column was the total cost of the particular spacecraft for purposes of calculating damages. Plaintiff's Submission on Compensation Base Cost Issues (6/9/89) at 32–36; Defendant's Post–Trial Memorandum on Unresolved Cost Issues (6/12/89) at 3; Tr. 18,088–124; joint statement of parties submitted in open court on May 20, 1991, Tr. 20,753–54, 20,890–91.

**6.** GPS QTV eventually was modified and became GPS FV 6. Thus, GPS QTV and GPS FV 6 are counted as one satellite for liability purposes, but two different taking dates are relevant when calculating damages.

APPENDIX B—Continued

| SPACECRAFT | ROYALTY DATES | | COMPENSATION BASE (in millions) | CITATION |
|---|---|---|---|---|
| | 1st Date | 2nd Date | | |
| 40.  FV11 | 01/27/84 | 04/26/84 | 25.404 | Agreement |
| 41.  FV12 | 01/24/86 } | | | Agreement |
|     FV12 (imp.) [7] | 01/24/86 } | | $  230.849 | Agreement |
| 42.  FV13 | 04/24/87 | 07/23/87 | 250.899 | Agreement |
| 43.  FV14 | 12/18/87 | 03/17/88 | 64.015 | Agreement |
| 44.  FV15 | 06/26/90 | 09/24/90 | 47.095 | This opinion |
| 45.  FV16 | 12/18/87 | 03/17/88 | 58.615 | Agreement |
| 46.  FV17 | 04/20/88 | 07/19/88 | 55.352 | Agreement |
| 47.  FV18 | 08/17/89 | 11/15/89 | 51.035 | This opinion |
| 48.  FV19 | 06/30/88 | 09/28/88 | 53.081 | Agreement |
| 49.  FV20 | 12/18/89 | 03/18/90 | 48.049 | This opinion |
| 50.  FV21 | 10/13/89 | 01/11/90 | 49.193 | This opinion |
| 51.  FV22 | 09/11/90 | 12/10/90 | 43.887 | This opinion |
| 52.  FV23 | 06/26/90 | 09/24/90 | 106.822 | This opinion |
| 53.  FV24 | 09/11/90 | 12/10/90 | 45.928 | This opinion |
| 54.  FV25 | 09/11/90 | 12/10/90 | 45.018 | This opinion |
| 55.  FV26 | 09/11/90 | 12/10/90 | 44.410 | This opinion |
| 56.  FV27 | 09/11/90 | 12/10/90 | 43.553 | This opinion |
| 57.  FV28 | 09/11/90 | 12/10/90 | 43.337 | This opinion |
| 58.  FV29 | 09/11/90 | 12/10/90 | 49.535 | This opinion |
| 59.  FV30 | 09/11/90 | 12/10/90 | 43.449 | This opinion |
| 60.  FV31 | 09/11/90 | 12/10/90 | 47.016 | This opinion |
| 61.  FV32 | 09/11/90 | 12/10/90 | 41.999 | This opinion |
| 62.  FV33 | 09/11/90 | 12/10/90 | 41.903 | This opinion |
| 63.  FV34 | 09/11/90 | 12/10/90 | 42.083 | This opinion |
| 64.  FV35 | 09/11/90 | 12/10/90 | 40.629 | This opinion |
| 65.  FV36 | 09/11/90 | 12/10/90 | 40.351 | This opinion |
| | | | | |
| HELIOS (2) | | | | |
| 66.  A | 12/10/74 | | $   99.040 | Agreement |
| 67.  B | 01/15/76 | | 28.882 | Agreement |
| | | | | |
| IMP (Interplanetary Monitoring Platform) (2) | | | | |
| 68.  X | 09/11/73 | | $   15.639 | Agreement |
| 69.  J | 10/25/73 | | 10.478 | Agreement |
| | | | | |
| ISEE (International Sun–Earth Explorer) (3) | | | | |
| 70.  A | 10/22/77 | | $   28.434 | Agreement |
| 71.  B | 10/22/77 | | 29.763 | This opinion |
| 72.  C | 08/12/78 | | 25.445 | Agreement |
| | | | | |
| IUE–A (International Ultraviolet Explorer) (1) | | | | |
| 73. | 01/26/78 | | $   57.768 | Agreement |
| | | | | |
| NTS–2 (Navigation Technology Satellite) (1) | | | | |
| 74. | 06/23/77 | | $   19.276 | Agreement |

**7.** GPS FV 12 was the subject of two different contracts, hence the distinction between FV 12 and FV 12 (improved). GPS FV 12 and FV 12 (improved) are considered as one spacecraft for liability purposes. Further, plaintiff has stipulated to a single taking date for calculating damages (Pl.Br., June 9, 1989, p. 85).

APPENDIX B—Continued

| SPACECRAFT | ROYALTY DATES | | COMPENSATION BASE | CITATION |
|---|---|---|---|---|
| | 1st Date | 2nd Date | (in millions) | |
| PIONEER (2) | | | | |
| 75. 10 | 09/11/73 } | | | |
| 76. 11 | 09/11/73 } | | $   84.491 | Agreement |
| SOLRAD (Solar Radiation Spacecraft) (4) | | | | |
| 77. 9 | 09/11/73 } | | | |
| 78. 10 | 09/11/73 } | | $   17.511 | Agreement |
| 79. 11A | 03/14/76 } | | | |
| 80. 11B | 03/14/76 } | | $   27.574 | This opinion |
| STP 78–2 (SCATHA) (Spacecraft Charging at High Altitude) (1) | | | | |
| 81. | 10/26/78 | | $   35.933 | Agreement |

TOTAL COMPENSATION BASE:      $3,577.518